UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: **07-20088**

**CIV-UNGARO-BENAGES**

MAGISTRATE JUDGE
O'SULLIVAN

HISTORY, S.A.,

      Plaintiff,

v.

RICA FOODS, INC.,

      Defendant.

_____/



## DEFENDANT'S NOTICE OF REMOVAL

      Pursuant to 28 U.S.C. § 1441, the defendant Rica Foods, Inc. ("Rica Foods"), a corporation organized and existing under the laws of Nevada, gives notice of the removal of this action from the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, to the United States District Court for the Southern District of Florida.  The removal of this case is based on the following grounds:

      1.     On or about December 21, 2006, the plaintiff History, S.A. ("History"), a Panamanian corporation, initiated an action in the Miami-Dade County Circuit Court styled *History, S.A. v. Rica Foods, Inc.*, Case No. 06-27680-CA-25.

      2.     History's complaint in the Miami-Dade County Circuit Court asserts two claims:  one for a constructive trust, and one for a permanent injunction.  See generally Verified Complaint, attached hereto as **Exhibit 1**.

Case No. _____

3.      The Verified Complaint filed in Miami-Dade County Circuit Court by History against Rica Foods is based on, and contains claims which are linked and are inter-related to, claims brought in a separate lawsuit by History's principal and majority shareholder, Mr. Leonardo López. This federal lawsuit has been pending for almost a year before Judge Huck in the United States District Court for the Southern District of Florida and is styled <u>Leonardo López v. Rica Foods, Inc.</u>, Case No. 06-20710-Civ-Huck/Simonton.

4.      Pursuant to 28 U.S.C. § 1446(b), this removal is timely because thirty days have not elapsed since January 3, 2007, the date on which Rica Foods was purportedly served with a copy of History's Verified Complaint.

5.      Removal of this action is proper under 28 U.S.C. § 1441(a), which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." As demonstrated below, the district courts of the United States have original jurisdiction over this action based on 28 U.S.C. § 1332 (diversity of citizenship), in that History is now and was at the time the action commenced diverse in citizenship from Rica Foods. <u>See Camper & Nicholsons Int'l v. Blonder Marine & Charter, Inc.</u>, 793 F. Supp. 318, 320 (S.D. Fla. 1992) ("[T]he [diversity] statute contemplates federal jurisdiction over a lawsuit where . . . the

2

suit is between citizens of an American state and citizens or subjects of a foreign state.").

6.     History is a corporation organized and existing under the laws of Panama. See Verified Complaint, at ¶ 3.

7.     Rica Foods is a Nevada corporation with its principal place of business in Miami-Dade County, Florida. See id., at ¶ 2.

8.     The amount in controversy in this action, exclusive of interest and costs, exceeds the sum of US $75,000.  Indeed, as alleged in History's Verified Complaint, History estimates its purported damages to be in excess of  US $10,011,217.72.  See id., at ¶ 18.  Thus, the total amount in controversy exceeds US $75,000.  See Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1357 (11th Cir. 1996), overruled on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000).  See also Fellows v. E & J Enters. of Collier County, Inc., No. 205CV561FTM29SPC, 2006 WL 314505, *4 (M.D. Fla. Feb. 9, 2006) ("The Court finds that this [demand] letter can be considered as to the jurisdictional amount issue. . . . The Court concludes that even when the letter is discounted for normal puffery, defendant has satisfied its burden as to the jurisdictional amount."); Dunlap v. N.Y. Life Ins. Co., 958 F. Supp. 589, 591 (M.D. Fla. 1997), citing St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288 (1938) ("[F]or the purpose of establishing the amount in controversy, 'the sum claimed by the plaintiff controls if the claim is apparently made in good faith.'").

3

9.      The Southern District of Florida is the judicial district embracing the
place where the state court case was brought and is pending (see 28 U.S.C. §  89(b));
and thus, it is the proper district court to which this case should be removed.  See
28 U.S.C. §§ 1441(a) and 1446(a).  In addition, the Miami Division is the proper
division within the Southern District of Florida to which the case should be removed.
See S.D. Fla. Local Rule 3.1(C).

10.     Pursuant to 28 U.S.C. § 1446(a), Rica Foods is filing with this Notice of
Removal, as **Exhibit 1**, the Verified Complaint and all documents constituting all
process, pleadings, and orders existing on file in the state court in this removed
action.

11.     In accordance with 28 U.S.C. § 1446(d), Rica Foods is also
simultaneously filing a true and correct copy of this Notice of Removal with the
Clerk of the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade
County, Florida.  A copy of the Notice of Filing Notice of Removal is attached hereto
at **Exhibit 2**.

WHEREFORE, the defendant Rica Foods, pursuant to 28 U.S.C. § 1441 and
in conformance with the requirements set forth in 28 U.S.C. § 1446 and the Local
Rules of the United States District Court for the Southern District of Florida,
removes this action from the Circuit Court of the Eleventh Judicial Circuit in and
for Miami-Dade County, Florida, to this Court.

4

Case No. _____

Dated:  January 10, 2007

Respectfully submitted,

By: _____

Daniel E. González (Florida Bar No. 780030)
degonzalez@hhlaw.com
Richard C. Lorenzo (Florida Bar No. 071412)
rlorenzo@hhlaw.com
Maria Eugenia Ramirez (Florida Bar No. 349320)
meramirez@hhlaw.com
HOGAN & HARTSON L.L.P.
Mellon Financial Center
1111 Brickell Avenue
Suite 1900
Miami, Florida 33131
305.459.6649 (Telephone)
305.459.6550 (Facsimile)
Attorneys for Defendant
Rica Foods, Inc.

5

Case No. _____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

by U.S. mail this 10th of January, 2007, to Theodore C. Miloch II, Esquire, Infante,

Zumpano, Hudson & Miloch, LLC, Ponce de Leon Blvd., Penthouse 1280, Coral

Gables, Florida  33134.

By: _____

Daniel E. González

6

# EXHIBIT 1

01/03/2007 WED 15:27 FAX                                                        ☒003/103

IN THE CIRCUIT COURT OF THE 11ᵀᴴ JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.

0 6 - 2 7 6 8 0 CA 2 5

HISTORY S.A.

      Plaintiff,

    v.

RICA FOODS, INC.                                          **S U M M O N S**

      Defendant.

_____/

**THE STATE OF FLORIDA:**

To Each Sheriff of Said State:

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint in this
Action to the register agent on behalf of the above-captioned Defendant:

*Corporation Trust Company of Nevada*
*Registered Agent for Rica Foods, Inc.*
*6100 Neil Road, Ste 500*
*Reno, NV 89511*

Each Defendant is required to serve written defenses to the Complaint or Petition on Plaintiff's
attorney, to-wit:

    **Theodore C. Miloch II, Esquire**
    Infante Zumpano Hudson
      & Miloch, P.A.
    2801 Ponce de Leon Boulevard
    Penthouse Suite 1280
    Coral Gables, Florida 33134
    **(305) 503-2990 Telephone**
    **(305) 774-5908 Facsimile**

within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of
service, and to file the original of the defenses with the Clerk of the Court either before service on
Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered
against that Defendant for the relief demanded in the Complaint or petition.

DATED this ___ DEC 2 1 2006 ___ 2006

                   Clerk of said Court

                      ALBA DE LA SIERRA

             By _____

                      As Deputy Clerk

01/03/2007 WED 15:27  FAX                                                    ☑004/103

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. 06-27680 CA 25

HISTORY, S.A.

    Plaintiff,

vs.

RICA FOODS, INC.,

    Defendant.

_____/

## NOTICE OF HEARING

(Special Set – 15 minutes)

PLEASE TAKE NOTICE that Plaintiff, History S.A. Memorandum of Law in Support of Plaintiff's Verified Ex-Parte Motion for Temporary Injunction will be called up for hearing before the Honorable Judge Scott Bernstein at the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, 73 West Flagler Street, Miami, Florida, on **Tuesday, January 9, 2007 at 3:00 p.m.** or as soon thereafter as counsel may be heard.

Undersigned Counsel certifies that a bona fide effort to agree or narrow the issues on the motion noticed has been made with opposing counsel or will be made prior to the hearing.

In accordance with the Americans with Disabilities Act of 1990 (ADA), if you are a person with a disability who needs any accommodation to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. For proceedings within the 11th Circuit of Florida, please contact the Dade County Court's ADA Coordinator at 73 West Flagler Street, Room 1600, Miami Florida 33130, telephone numbers (305) 375 2006 for voice or (305) 375 2007 for TDD and (305) 350 6205 for fax, within two (2) working days of your receipt of this document. TDD users may also call 1-800-955-8771 for the Florida Relay Service.

    Respectfully submitted,

INFANTE, ZUMPANO, HUDSON & MILOCH, LLC
Attorneys for Defendant/Counter-plaintiff
2801 Ponce de Leon Blvd.
Penthouse 1280
Coral Gables, Florida 33134
Telephone: (305) 503-2990
Facsimile: (305) 774-5908

By: _____

    Theodore C. Miloch, II Esq.
    Florida Bar Number: 0040193

## CERTIFICATE OF SERVICE

·WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via Process Server to Monica Chaves, Registered Agent for Rica Foods, with the Complaint on this 2nd day of January, 2007.

By: _____

**Theodóre C. Miloch, II Esq.**
Florida Bar Number: 0040193

2

01/03/2007 WED 15:42  FAX                                                    ☒062/10

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.  0 6 - 2 7 6 8 0 CA 2 5

HISTORY, S.A.

    Plaintiff,

vs.

RICA FOODS, INC.,

    Defendant.

_____/

ORIGINAL
FILED
DEC 2 1 2006
HARVEY RUVIN
CLERK

## VERIFIED COMPLAINT

    Plaintiff, History, S.A. ("History"), by and through undersigned counsel and pursuant to the Florida Rules of Civil Procedure, sues Defendant, Rica Foods, Inc. ("Rica"), a Nevada corporation with its principal place of business located in Coral Gables, Miami-Dade County, for damages and in support thereof, states the following:

### JURISDICTION, PARTIES, VENUE

    1.    This is an action for damages in excess of $15,000.00, exclusive of interest and costs. Therefore, this action is within the jurisdictional limits of this Court.

    2.    At all material times, Rica was and is incorporated in Nevada with its principal place of business in Miami-Dade County, Florida.   At all material times, Rica maintained offices and transacted business in Miami-Dade County, Florida.   Accordingly, venue is proper in this Court.

    3.    Plaintiff, History, S.A., is a Panamanian corporation.  History is the holder of four (4) promissory notes totaling $10,011,217.72 U.S. Dollars plus accrued interest in which Inversiones La Ribera, S.A., a Costa Rican corporation, is the debtor ("Notes").  La Ribera has

defaulted on the subject Notes.  True and correct copies of these notes are attached hereto as Exhibit "A."

4.      Defendant Rica is a public corporation recently de-listed from the American Stock Exchange as a result of defective filings with the Securities Exchange Commission as more fully set forth in the American Stock Exchange, LLC's Determination and Notification of Removal from Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, a true and correct copy of which is attached hereto as Exhibit "B."  Calixto Chaves ("Chaves") was at material times the President, Chief Executive Officer, Director and majority shareholder of Rica. Chaves also was the sole owner, President, Chief Executive Officer and Director of Inversiones La Ribera, S.A., a Costa Rican holding company formed for the purpose of holding Chaves' assets.  By virtue of its de-listing from the American Stock Exchange, Rica's shares are no longer traded on any national stock exchange and are virtually valueless.

### La Ribera, Pipasa and Rica

5.      Inversiones La Ribera, S.A ("La Ribera") is a holding company and its principal asset was its holding and ownership of approximately 40% of the outstanding shares of Pipasa, S.A., a large Costa Rican poultry producer ("Pipasa").

6.      Prior to 1998, La Ribera and Rica collectively held all of the outstanding common stock shares of Pipasa. From 1998 through the present, Defendant Rica has been deeply involved in the day-to-day operations of Pipasa. In 1998, Rica held approximately 60% of Pipasa's outstanding common stock shares and La Ribera held the remaining approximate 40% of Pipasa's outstanding shares.

7.      On September 28, 1998, Rica entered into a stock purchase agreement with La Ribera in which Rica was to purchase the remaining approximate 40% of Pipasa's outstanding

common stock which was held by La Ribera. In exchange, Rica agreed to transfer 11,050,784 shares of Rica's common stock (the "Rica Shares") to La Ribera.[1] At this time, the Rica Shares had a fair market value of more than thirteen million dollars ($13,000,000.00). A true and correct copy of the Stock Purchase Agreement between Rica and La Ribera filed with the Securities and Exchange Commission is attached hereto as Exhibit "C." The Rica Shares were to be owned in full by La Ribera and was to be the source of collateral and security for the repayment of the Notes to History pursuant to Costa Rican law.

8.      On December 7, 1999, Rica publicly announced that it had acquired the remaining approximate 40% of outstanding common stock of Pipasa ("Pipasa Stock") through the Stock Purchase Agreement, making Pipasa a wholly owned subsidiary of Rica. A true and correct copy of the Rica's December 7, 1999 Form 8-K Report filed with the Securities Exchange Commission containing Rica's announcement is attached hereto as Exhibit "D." However, based on information obtained by History, it is believed that Rica never delivered to La Ribera the 3,683,595 Rica Shares pursuant to the Stock Purchase Agreement and as disclosed in Rica's filings with the Securities and Exchange Commission.

### The Notes

9.      On May 30, 2003, La Ribera issued four (4) promissory notes attached hereto as Composite Exhibit "A" payable to History in the total amount of $10,011,217.72 plus interest. Pursuant to the terms of the Notes, the Notes became due and payable on January 3, 2005.

10.      History made the Notes with La Ribera based on the representations contained in Rica's filings with the Securities and Exchange Commission as well as other mediums wherein Rica represented that the Rica Shares had been transferred to La Ribera in exchange for the

---

[1] Subsequently, Rica conducted a 3 for 1 reverse stock split which served to reduce the number of shares to be transferred to La Ribera pursuant to the Stock Purchase Agreement from 11,050,784 shares to 3,683,595 shares.

transfer of the Pipasa Stock. In addition, in 1997, 1998 and 1999, while in Miami and prior to the execution of the underlying Notes, Chaves as President and acting on behalf of Rica, personally assured Leonardo Lopez, the principal and majority shareholder of History, that the Rica Shares had been transferred to La Ribera.  Again, in September, 2004, November, 2004 and in January, 2005, Chaves assured Leonardo Lopez of History that the Rica Shares had been transferred to La Ribera and served as security and collateral for the Notes under Costa Rican law.

      11.    At the time the Notes were negotiated, Chaves, continuously assured History that Rica had transferred the 3,683,595 Rica Shares to La Ribera. Hence, History at all material times was led to believe and, in fact did believe, that the 3,683,595 Rica Shares were transferred to La Ribera and served to guarantee the repayment of the Notes.

      12.    On or about January 3, 2005, the Notes became due and payable, but La Ribera failed to satisfy the Notes or any portion thereof despite History's repeated demands for payment. At the time the Notes matured and demand was made for payment, the market value of the 3,683,595 Rica Shares was approximately $19,670,397.00 which would have satisfied the underlying Notes had the Rica Shares been tendered to La Ribera pursuant to the Stock Purchase Agreement and served as collateral to satisfy unpaid loans under Costa Rican law.

      13.    La Ribera held no assets to secure the Notes at the time the Notes became due based upon the fact that La Ribera's holdings in Pipasa had been transferred to Rica and the Rica Shares were not transferred to La Ribera pursuant to the Stock Purchase Agreement as represented by Rica and because La Ribera's other assets had been liquidated. Essentially, La Ribera became an empty shell and was unable to satisfy the Notes because of its wrongful transfer of the Pipasa Stock to Rica pursuant to the Stock Purchase Agreement and because of

Rica's failure to transfer the 3,683,595 Rica Shares to La Ribera pursuant to the Stock Purchase Agreement.

14.     La Ribera has no intention of paying back the Notes.  In fact, at a meeting at the office of Servicios Pastorales of the Catholic Church of Costa Rica which occurred on or about September 28, 2005 and which was organized by Monsignior Angel Sancasimiro, the treasurer of the Catholic Church of Costa Rica, and attended by Leonardo Lopez on behalf of History; Father Guillermo Godinez, a representative of the Catholic Church of Costa Rica; and, Jorge Torres, a representative of the Catholic Church, among others, those present were advised by Rafael Morales, former counsel for La Ribera, that Victor Oconitrillo, officer and director of Pipasa and Rica, and Calixto Chaves, officer and director of Pipasa, Rica, and La Ribera had previously determined that La Ribera would not pay or satisfy the History Notes. There was no justification given as to why La Ribera would not repay the Notes despite the repayment of other debts of La Ribera through Chaves' other assets.

15.     History is in the process of preparing its "Demanda" (i.e. Complaint) to initiate legal proceedings against La Ribera in Costa Rica based upon its failure to pay the Notes. The proceeding will be ancillary to this proceeding.

16.     Based on the foregoing, History has retained the undersigned counsel to bring this suit and is obligated to pay counsel a reasonable fee for services rendered, as well as costs.

COUNT I

**CONSTRUCTIVE TRUST**

17.     Plaintiff, History, realleges and incorporates by reference paragraphs 1 through 16 as though fully set forth herein.

18.     On May 30, 2003, La Ribera provided four (4) promissory notes payable to History totaling $10,011,217.72 plus interest.

19.     At all material times, History maintained a confidential business relationship with Chaves, Rica, Pipasa, and La Ribera through its principal and representative, Leonardo Lopez. History knew that Chaves was a principal of Rica, Pipasa and La Ribera and, as a result, believed and relied upon Chaves' assurances and promises on behalf of Rica that the La Ribera Notes were secured by the 3,683,595 Rica Shares pursuant to Costa Rican law which Rica represented had been transferred to and were held by La Ribera pursuant to the terms of the Stock Purchase Agreement attached hereto as Exhibit "C." As a result, History relied upon the purported transfer of the respective shares and entered into the Notes with La Ribera.

20.     On January 3, 2005, the Notes matured and became due and payable to History. La Ribera did not pay the Notes when due and History was unable to pursue a security interest against the Rica Shares that purportedly "secured" Plaintiff's Notes with La Ribera because Rica did not transfer the Rica Shares pursuant to the Stock Purchase Agreement to La Ribera and as represented by Rica's President and Director, Chaves and Rica itself in its SEC filings.  In addition, La Ribera had become an empty shell by virtue of the transfer of its principal asset, the remaining approximate 40% of the Pipasa shares, to Rica pursuant to the Stock Purchase Agreement.

21.     By failing and refusing to transfer the 3,683,595 Rica shares to La Ribera, Rica was unjustly enriched by becoming the owner of the remaining 40% of Pipasa shares held by La Ribera without providing any consideration to La Ribera for the Pipasa Stock pursuant to the Stock Purchase Agreement. Rica is wrongfully holding the shares of Pipasa which rightfully belong to La Ribera given Rica's failure to provide any consideration to La Ribera for its

acquisition thereof and which should have served as collateral for the benefit of History under the Notes under Costa Rican law and has been unjustly enriched thereby.

22.     History has a direct claim against the Pipasa shares that Rica wrongfully acquired since La Ribera is the true owner of those shares because Rica never provided any consideration for the Pipasa Stock rendering the transfer of no effect.

23.     History has a right to a constructive trust over the Pipasa Stock originally held by La Ribera and transferred to Rica pursuant to the Stock Purchase Agreement by virtue of the fact that the Pipasa Stock should have served as security for the underlying Notes and because Rica is not a bona fide purchaser/holder of the Pipasa Stock because it never provided any of the Rica Shares to La Ribera pursuant to the Stock Purchase Agreement.

WHEREFORE, Plaintiff, History, S.A. respectfully requests that this Court exercise its power in equity to impose a constructive trust pending the outcome of History's proceedings against La Ribera in Costa Rica and the present litigation over the Pipasa Stock originally held by La Ribera and transferred to Rica pursuant to the Stock Purchase Agreement together with interest and the costs of this suit, and such further relief this Court deems just and proper.

## COUNT II

## CLAIM FOR PERMANENT INJUNCTION

24.     Plaintiff, History, realleges and incorporates by reference paragraphs 1 through 16 as though fully set forth herein.

25.     **Injunction**: Based upon the fact that Rica, a publicly traded company recently delisted from the American Stock Exchange, never delivered to La Ribera the 3,683,595 Rica common stock shares pursuant to the Stock Purchase Agreement attached hereto as Exhibit "B" which were to serve as security for the repayment of the underlying Notes under Costa Rican law

as well as the fact that La Ribera has become an empty shell by virtue of its transfer of the remaining approximate 40% of the Pipasa shares to Rica pursuant to the Stock Purchase Agreement and the liquidation of La Ribera's other assets, this Court should enjoin Rica, its employees, officers, directors, representatives, transfer agents, representatives and other agents from selling, transferring, or in any manner encumbering the Pipasa Stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement and for which La Ribera received no consideration and thus it is appropriate for the Court to: a) assume control over Rica's respective financial assets related to the Notes, namely  the Pipasa Stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement; b) preserve assets and funds so as to prevent any further injury to Plaintiff; and, c) enter an injunction preventing Rica from selling, transferring or encumbering the Pipasa Stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement or any of the approximate 40% ownership interest in Pipasa Rica acquired through La Ribera's transfer of the Pipasa stock to Rica pursuant to the Stock Purchase Agreement.

26.    This Court certainly has jurisdiction to enter an order to ensure that Rica's holdings of the Pipasa Shares are not secreted or dissipated before the entry of a final judgment concluding this action and History's action against La Ribera related to the notes in Costa Rica.

27.    **Immediate Irreparable Injury**: As set forth herein, Plaintiff has suffered and continues to suffer immediate and irreparable injury, loss and damage as the result of Defendant's activities. Defendant failed and refused to transfer to La Ribera the 3,683,595 Rica Shares at a time when the shares were valued in excess of $19,000,000.00. The shares have now been delisted and are trading on the pink sheets, and their value has plummeted substantially. In addition, La Ribera is an "empty corporate shell" without any assets by virtue of the corporation's prior liquidation of assets as well as its wrongful transfer of its approximate 40%

holding in Pipasa to Rica pursuant to the Stock Purchase Agreement for which it received no consideration.  Upon information and belief, Rica is now trying to sell all of its assets, including its holdings in Pipasa..  If Defendant is allowed to proceed with the sale or liquidation of the Pipasa Shares, the Plaintiff will have no avenue for any recovery related to La Ribera's failure to pay on the underlying Notes by virtue of Rica's acts.

    28.    **Inadequate Legal Remedy**: Plaintiff has no adequate remedy at law against Rica because Rica was not a party to the underlying Notes and Plaintiff was not a party to the underlying Stock Purchase Agreement between Rica and La Ribera.  In addition, Plaintiff has no adequate remedy at law because if Rica transfers or liquidates the Pipasa shares wrongfully acquired from La Ribera through the Stock Purchase Agreement, any recovery Plaintiff may obtain in its ancillary matter on the Notes against La Ribera in Costa Rica will be moot, because La Ribera will have no assets to satisfy the judgment by virtue of the fact that La Ribera's principal asset, its approximate 40% holding in Pipasa, was transferred to Rica pursuant to the Stock Purchase Agreement and La Ribera did not receive the 3,683,595 Rica Shares or any other consideration in return.   The Rica shares should have served as collateral for the History notes and was the reason that History entered into the Notes with La Ribera.  Rica should not be able to maintain the benefit of the Pipasa Shares given its failure to provide any consideration for the Pipasa Shares and if Rica sells, transfers or otherwise encumbers the subject Pipasa stock, History will not have any legal remedy against Rica or any chance of recovery on the History Notes.  Thus, the threat of injury to Plaintiff, an innocent third party, outweighs any possible harm to Defendants which might accrue by entry of an injunction preventing the transfer of the Rica's Pipasa shares at issue.

29.   **Substantial Likelihood of Success**:  Plaintiff has a substantial likelihood of

success on the merits of this case which are very straight forward.  Simply put, History is the

holder of four (4) promissory notes in which La Ribera is the debtor.  La Ribera did not pay

History on the Notes when the notes matured.  History was unable to recover on its security

interest in the Notes afforded under Costa Rican law that provides that all debts of a corporation

are secured by its assets because La Ribera is an "empty shell" because: 1) Rica never transferred

the 3,683,595 Rica Shares to La Ribera pursuant to the Stock Purchase Agreement; 2) La Ribera

transferred its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase

Agreement for which it received no consideration; and, 3) all or most of La Ribera's assets

which could have provided security for History's Notes had been liquidated prior to the maturity

of the Notes.   Based upon the fact that Rica did not provide any consideration for the Pipasa

Shares obtained from La Ribera pursuant to the Stock Purchase Agreement, it is not a bona fide

purchaser or holder in due course of the Pipasa Shares which, accordingly renders the Pipasa

Shares an asset of La Ribera and should serve as security for the underlying Notes held by

History.

30.   **Public Interest.**  In addition, the public interest would be greatly served in this

matter by granting the requested injunction as it would support the public's desire and interest to

promote foreign commercial transactions involving United States companies and would promote

and support the reasonable expectations of parties involved in commercial transactions involving

United States companies that the bargained for collateral to such transactions would be

exchanged and preserved consistent with the parties' agreements.  The public interest would also

be served by reversing the inequitable conduct of Rica; and in an age of easy global mobility of

capital, it preserves the attractiveness of the United States as a center for financial transactions.

WHEREFORE, Plaintiff requests that this Court enjoin Defendant, Rica Foods, Inc., and any of its principals, officers, directors, employees, transfer agents, representatives and other agents from:

    a.    concealing, withholding, destroying or altering any of the books, records, forms, writings, papers, and other documents relating to the transfer of the approximate 40% outstanding common shares of Pipasa stock from La Ribera to Rica pursuant to the Stock Purchase Agreement;

    b.    disbursing, transferring, encumbering in any manner or otherwise using the approximate 40% of the outstanding common shares of Pipasa stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement;

    c.    disbursing, transferring or otherwise using funds derived from any sale or encumbrance of the approximate 40% of the common shares of Pipasa stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement;

    d.    In the event the shares have been sold or transferred, an accounting of the consideration received in cash or otherwise as a result of the dissipation.

### Demand For Jury Trial

31.  Plaintiff demands a trial by jury of all issues so triable.

Date:  December 20, 2006

Respectfully Submitted,

By:
Theodore C. Miloch II, Esq.
Florida Bar Number: 0040193
INFANTE, ZUMPANO, HUDSON & MILOCH, LLC
Attorney for Plaintiffs
Ponce de Leon Blvd.
Penthouse 1280
Coral Gables, FL 33134
Tel. 305.503.2990
Fax. 305.774.5908

☑073/10

## Declaration

Under penalties of perjury, I declare that I have read the foregoing Verified Complaint and the facts stated in it are true.

Leonardo Lopez

01/03/2007 WED 15:31  FAX

☑026/103

LUGAR Y FECHA  San Jose,  30 de mayo  2003

EL SUSCRITO HACE CONSTAR QUE ACEPTA
ESTA LETRA DE CAMBIO.

(FIRMA DEL LIBRADO)
Inversiones La Ribera, S.A.
3-101-017556

ESPACIO PARA TIMBRES

**LETRA DE CAMBIO**

No. ____

EL DÍA  3 de enero  2005
(FECHA DE PAGO)

PAGAR POR ESTA LETRA DE CAMBIO, A LA ORDEN DE ____ History, S.A. (domiciliada en Panamá).- LA CANTIDAD DE ____
(NOMBRE DE LA PERSONA A QUIEN SE HA DE HACER EL PAGO)

SE SERVIRÁ Inversiones La Ribera, S.A. Ced. Jur.
(NOMBRE DEL LIBRADO) 3-101-017556

EN San Jose, Costa Rica
(LUGAR EN QUE HA DE EFECTUARSE EL PAGO)

POR _____ 977/100

CON INTERESES AL 12.00% anual
(EL LUGAR)

TANTO EL GIRADOR COMO EL GIRADO, ENDOSANTE O AVALISTAS, ASÍ COMO CUALQUIERA OTRA PERSONA QUE INTERVINIERE EN ESTA LETRA DE CAMBIO, TIENEN POR RENUNCIADOS EL DOMICILIO, REQUERIMIENTOS DE PAGO, TRÁMITES DEL JUICIO EJECUTIVO Y DILIGENCIAS QUE PROTESTO POR FALTA DE ACEPTACIÓN Y DE PAGO, QUEDANDO ADEMÁS AUTORIZADA LA CONCESIÓN DE PRÓRROGA SIN CONSULTA NI NOTIFICACIÓN.

San Jose, 30 de mayo del 2003
(LUGAR Y FECHA DE EMISIÓN)

Inversiones La Ribera, S.A.
(FIRMA DEL GIRADOR)

33709

Inversiones La Ribera, S.A.

**EXHIBIT A**



LUGAR Y FECHA  SAN JOSE, 30 MAYO 2003

EL SUSCRITO HACE CONSTAR QUE ACEPTA
ESTA LETRA DE CAMBIO.

(FIRMA DEL LIBRADO)

INVERSIONES LA RIBERA S.A.
Ced. Jur. 3-101-017556

ESPACIO PARA TIMBRAJE

**LETRA DE CAMBIO**

No. _____

EL DIA  03  de enero del  2005
(FECHA DE PAGO)

SE SERVIRA  INVERSIONES LA RIBERA S.A.
(NOMBRE DEL LIBRADO)

PAGAR POR ESTA LETRA DE CAMBIO, A LA ORDEN DE  History S.A (Amicilia)  LA CANTIDAD DE
(NOMBRE DE LA PERSONA A QUIEN SE HA DE HACER EL PAGO)

CED. JUR. 3-101-017556

POR

CON INTERESES AL pagaderos al vencimiento  EN  SAN JOSE, COSTA RICA
(LUGAR EN QUE HA DE EFECTUARSE EL PAGO)

TANTO EL GIRADOR COMO EL LIBRADO, ENDOSANTE O AVALISTAS, ASI COMO CUALQUIERA OTRA PERSONA QUE INTERVINIERE EN ESTA
LETRA DE CAMBIO, TIENEN POR RENUNCIADOS EL DOMICILIO, REQUERIMIENTOS DE PAGO, TRAMITES DEL JUICIO EJECUTIVO Y DILIGENCIAS
DE PROTESTO POR FALTA DE ACEPTACION Y DE PAGO, QUEDANDO ADEMAS AUTORIZADA LA CONCESION DE PROMOGA SIN CONSULTA, NI
NOTIFICACION.

SAN JOSE, 30 MAYO 2003
(LUGAR Y FECHA DE EMISION)

(NOMBRE DEL LIBRADOR)

INVERSIONES LA RIBERA S.A.

INVERSIONES LA RIBERA S.A.

33709

01/03/2007 WED 15:32  FAX                                                    ☑028/10



33709

LUGAR Y FECHA    30 mayo 2003,  San José

EL SUSCRITO HACE CONSTAR QUE ACEPTA
ESTA LETRA DE CAMBIO.

(FIRMA DEL LIBRADO)

INVERSIONES LA RIBERA S.A.
CED. JUR. 3-101-017556

(ESPACIO PARA TRÁMITES)

## LETRA DE CAMBIO

No. _____

EL DIA ___ 03 de enero de 2005 _____
(FECHA DE PAGO)

SE SERVIRÁ  INVERSIONES LA RIBERA S.A.
Ced. Jur. 3-101-017556
(NOMBRE DE LA PERSONA A QUIEN SE LE HA DE HACER EL PAGO)

PAGAR POR ESTA LETRA DE CAMBIO, A LA ORDEN DE
HISTORY S.A. (domiciliada en Panamá) , LA CANTIDAD DE

POR $100.000.000.00

CON INTERESES AL _____ EN SAN JOSÉ, COSTA RICA
(SI LOS HAY)                          (LUGAR EN QUE SE HA DE EFECTUARSE EL PAGO)

pagaderos al vencimiento
TANTO EL GIRADOR COMO EL GIRADO, ENDOSANTE O AVALISTAS, ASÍ COMO CUALQUIERA OTRA PERSONA QUE INTERVINIERE EN ESTA
LETRA DE CAMBIO, TIENEN POR RENUNCIADOS EL DOMICILIO, REQUERIMIENTOS DE PAGO, TRÁMITES DEL JUICIO EJECUTIVO Y DILIGENCIAS
DE PROTESTO POR FALTA DE ACEPTACIÓN Y DE PAGO, QUEDANDO ADEMÁS AUTORIZADA LA CONCESIÓN DE PRÓRROGA SIN CONSULTA NI
NOTIFICACIÓN.

San José, 30 de mayo del 2003
(LUGAR Y FECHA DE EMISIÓN)

INVERSIONES LA RIBERA S.A.
Ced. Jur. 3-101-017556

01/03/2007 WED 15:32  FAX

☑029/10



33709

LETRA DE CAMBIO

No.

EL DIA __3 de enero del 2005__
(FECHA DE PAGO)

PAGAR POR ESTA LETRA DE CAMBIO, A LA ORDEN DE __History, S.A. (Domiciliada en Panama)__ LA CANTIDAD DE

SE SERVIRA __Inversiones La Ribera, S.A.__
(NOMBRE DEL LIBRADO)

EN __San Jose, Costa Rica__
(LUGAR EN QUE HA DE EFECTUARSE EL PAGO)

CON INTERESES AL _____

pagaderos EN __su vencimiento__

TANTO EL GIRADOR COMO EL GIRADO, ENDOSANTE O AVALISTAS, ASI COMO CUALQUIERA OTRA PERSONA QUE INTERVINIERE EN ESTA LETRA DE CAMBIO, TIENEN POR RENUNCIADOS EL DOMICILIO, REQUERIMIENTOS DE PAGO, TRAMITES DEL JUICIO EJECUTIVO Y DILIGENCIAS DE PROTESTO POR FALTA DE ACEPTACION Y DE PAGO, QUEDANDO ADEMAS AUTORIZADA LA CONCESION DE PRORROGA SIN CONSULTA NI NOTIFICACION.

__San Jose, 30 de mayo del 2003__
(LUGAR Y FECHA DE EMISION)

Inversiones La Ribera, S.A.
Ced. Jur. 3-101-017556

POR

LUGAR Y FECHA __San Jose, 30 de mayo__ 200

EL SUSCRITO HACE CONSTAR QUE ACEPTA
ESTA LETRA DE CAMBIO.

(FIRMA DEL LIBRADO)

Inversiones La Ribera, S.A.
Ced. Jur. 3-101-017556

ESPACIO PARA TIMBRES

BEFORE THE                                              Page 1 of 3

EX-99.25 2 rcf10242006lostappeal.htm

## AMERICAN STOCK EXCHANGE LLC

DETERMINATION AND NOTIFICATION OF REMOVAL FROM LISTING
AND/OR REGISTRATION UNDER SECTION 12(b) OF THE
SECURITIES EXCHANGE ACT OF 1934
Attachment to Form 25

October 24, 2006

The American Stock Exchange LLC (the "Amex" or "Exchange"), pursuant to Section 12(d) of the Securities Exchange Act of 1934 and Rule 12d2-2(b) promulgated thereunder by the Securities and Exchange Commission (the "Commission"), has determined to strike from listing and registration on the Exchange, the following:

**Rica Foods, Inc.**
Common Stock, $.001 Par Value
Commission File Number – 0-18222

1.    The standards of the Exchange provide, among other things, that consideration may be given to the removal of a security when: (i) the financial condition and/or operating results of the issuer appear to be unsatisfactory; (ii) the issuer has failed to comply with its listing agreements with the Exchange; or (iii) any other event shall occur or any condition shall exist which makes further dealings on the Exchange unwarranted.

In applying these standards, the Exchange gives consideration to delisting the securities of a company that is not in compliance with:

(a) Sections 134 and 1101 of the Amex Company Guide (the "Company Guide") which states that issuers are required to file information, documents and reports with the SEC on a timely basis; and

(b) Section 1003(d)(iii) of the Company Guide, which states that the Exchange, will normally consider suspending dealings in, or removing from the list, a security if the company or its management engages in operations, which, in the opinion of the Exchange, are contrary to the public interest.

2.    The common stock of Rica Foods, Inc. ("Rica Foods" or the "Company") does not qualify for continued listing for the following reasons:

(a) On December 21, 2005 Rica Foods disclosed that its independent auditor, Stonefield Josephson, Inc., withdrew its audit reports with respect to the Company's fiscal years ended September 30, 2004, 2003 and 2002 and that the Company's related financial reports should not be relied upon. Consequently, these Forms 10-K for the fiscal years ended September 30, 2004, 2003 and 2002 (the "Forms 10-K") were considered defective filings.

(b) Stonefield Josephson, Inc. withdrew its audit reports from the Forms 10-K because of the preliminary results of an investigation an independent Spe

**EXHIBIT**

B

BEFORE THE

Committee of the Company's Board of Directors was undertaking to examine allegations of certain related-party, undisclosed transactions (the "Alleged Transactions") between the Company and Mr. Calixto Chaves, his affiliates and/or Industrias Avicolas Intergradas, S.A. during Mr. Chaves' tenure as Chief Executive Officer of Rica Foods from August 1996 until January 2005 (the "Investigation"). More specifically, these Alleged Transactions consisted of Mr. Chaves, and certain of his affiliates, pledging various amounts of Rica's common stock and stock of its subsidiaries, that were not owned by him, to guarantee his personal loans. Subsequently, based on its review of the information provided by the Company, Staff determined that the Company or its management engaged in operations which, in the opinion of the Exchange, were contrary to the public interest.

(c) The Company failed to file its Form 10-K for the fiscal year ended September 30, 2005 and its Form 10-Q for the quarter ended December 31, 2005.

(d) On February 6, 2006 the Rica Foods disclosed in a Form 8-K/A that the Division of Enforcement of the Securities and Exchange Commission (the "SEC Staff") advised the Company that it was conducting a non-public inquiry. The SEC Staff requested that Rica Foods produce various documents, including, but not limited to, documents relating to or referring to transactions between the Company and its former Chief Executive Officer and any other related party transactions identified by the Company in connection with the Investigation.

3.     In reviewing the eligibility of the Company's common stock for continued listing, the Exchange has complied with its standards and procedures as follows:

(a) By letter dated December 27, 2005 Rica Foods was advised of its status in relation to the standards of the Exchange. Specifically, the AMEX advised the Company that it was not in compliance with Sections 134 and 1101 of the Company Guide, due to the Rica Food's Forms 10-K for the fiscal years ended September 30, 2004, 2003 and 2002 being considered defective filings. The Company was offered an opportunity to present a plan in support of continued listing.

(b) The Exchange's letter dated December 27, 2005 further notified the Company that Staff was reviewing Rica Food's Form 8-K filed December 21, 2005, and other periodic filings in which the Company disclosed, among other things, the Investigation. Pursuant to Section 132(e) of the Company Guide, Staff requested that Rica provide certain information related to the Investigation.

(c) Via correspondence dated January 5, 2006, the AMEX advised the Company of an additional instance of non-compliance with Sections 134 and 1101 of the Company Guide due to the Company's failure to timely file its Form 10-K for the fiscal year ended September 30, 2005.

(d) Subsequently, the Exchange determined that the Company's common stock did not qualify for continued listing. This determination, along with the Company's

BEFORE THE

2006. The Company was also notified that, in accordance with Sections 1203 and 1009(d) of the Company Guide, it could appeal Staff's determination no later than February 8, 2006 by requesting an oral or written hearing before a Listing Qualifications Panel of the Amex Committee on Securities (the "Panel").

(e) By letter dated February 8, 2006 the Company appealed Staff's determination and requested an oral hearing and a hearing was scheduled for March 13, 2006.

(f) By letter dated March 13, 2006 the Company was notified that the hearing was rescheduled until March 20, 2006.

(g) By letter dated March 23, 2006, the Exchange notified the Company of the Panel's decision to deny the Company's appeal for continued listing of its common stock on the Amex and to authorize delisting proceedings. The letter also informed the Company of its right, in accordance with Section 1205 of the Company Guide, to request that the Exchange's Committee on Securities review the Panel's decision within fifteen days.

(h) By letter dated April 7, 2006, the Company appealed the Panel's decision to the Exchange's Committee on Securities (the "Committee").

(i) By letter dated June 19, 2006 the Exchange notified the Company that the Committee had affirmed the decision of the Listing Qualifications Panel to delist the Company's common stock from AMEX pursuant to Rule 1003(d) of the Amex Company Guide.

Accordingly, the Exchange, having complied with all of its procedures, is authorized to file this application in accordance with Section 12 of the Securities Exchange Act of 1934 and the rules promulgated thereunder.

4.      In the opinion of the Exchange, all of the material facts relating to the reasons for this application are contained herein.

5.      The Exchange official whose signature is set forth below is duly authorized to file this application.

6.      In accordance with the provisions of Rule 12d2-2, a copy of this application has been forwarded to Mr. Gustavo Barboza, Chief Financial Officer of Rica Foods, Inc.

/s/

Dennis J. Meekins
Vice President, Listing Qualifications
American Stock Exchange LLC

http://www.sec.gov/Archives/edgar/data/789881/0001035802-99-0...

As permitted by Item 7(b)(2) of Form 8-K, the Registrant intends to file the required pro forma financial information by amendment to this Current Report on Form 8-K no later than 60 days after December 16, 1999.

(c)    EXHIBIT

2.1 Stock Purchase Agreement, dated as of September 28, 1998, and amended on November 9, 1998, by and between the Company and Inversiones La Ribera, S.A.

<PAGE>

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

RICA FOODS, INC.

Dated:   December 16, 1999          By:   /s/ Calixto Chaves
         ---------------------            -------------------------------------
                                          CALIXTO CHAVES
                                          President, Chief Executive Officer,
                                            and Chairman

<PAGE>

## EXHIBIT INDEX

EXHIBIT    DESCRIPTION

2.1        Stock Purchase Agreement, dated as of September 28, 1998, and amended on November 9, 1998, by and between the Company and Inversiones La Ribera, S.A.

<PAGE>

## EXHIBIT 2.1

### STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement") is made and entered into as of September 28, 1998, and amended as of November 9, 1998, by and between RICA FOODS, INC., a corporation organized under the laws of the State of Nevada (the "BUYER"), and INVERSIONES LA RIBERA, S.A., a corporation organized under the laws of the Republic of Costa Rica (the "SELLER").

### WITNESSETH:

WHEREAS, the Seller owns forty point forty four percent (40.44%) of the issued and outstanding shares of the common stock of Corporacion Pipasa, S.A. (the "COMPANY").

WHEREAS, the Company has authorized a total of five million, fifty thousand (5,050,000) shares of common stock, par value of one thousand (/cents/ 1.000) colones per share, of which four million, five hundred and fifty thousand ($4,550,000) shares are issued and outstanding; and

WHEREAS, the Seller desires to sell, convey, transfer, assign and deliver to the Buyer one million eight hundred forty thousand (1,840,000) shares of common stock of the Company, issued and outstanding, which represent forty point forty-four percent (40.44%) of the issued and outstanding shares of common stock of the Company, all of which are owned by the Seller (collectively, the "Shares"), upon and subject to the terms, covenants and conditions herein set forth. Upon the transfer of the Shares to the Buyer, the Buyer shall own one hundred percent (100%) of the total outstanding common stock of the Company.



http://www.sec.gov/Archives/edgar/data/76506/0001033002-99-0

herein contained and other good and valuable consideration, the receipt and
sufficiency of which are hereby conclusively acknowledged, the parties hereto
hereby agree as follows:

## ARTICLE I

1.1 SALE AND PURCHASE OF THE SHARES. Subject to the terms of this
Agreement, the Seller agrees to sell, assign, transfer, convey and
deliver the Shares to the Buyer, free and clear of any lien, security
interest, encumbrance, restriction, and claim of any kind whatsoever,
and the Buyer agrees to purchase the Shares from the Seller. The sale,
assignment, transfer, conveyance and delivery by the Seller of the
Shares to the Buyer shall be effected on or before January 31, 1999 by
the Seller's delivery to the Buyer of the stock certificates
evidencing the shares duly endorsed for transfer or accompanied by
stock powers duly executed in blank, this agreement signed before a
Notary Public under Costa Rican law, as necessary to effectively vest
in the Buyer all of the right, title and interest of the Seller in and
to the Shares. The parties may mutually agree in writing, and pursuant
to the mutual benefits provided by this Agreement, to the delivery by
the Buyer to the Seller of the stock certificates of the Company after
January 31, 1999, if so required and duly justified.

<PAGE>

1.2 PURCHASE PRICE AND PAYMENT: In consideration of the sale,
assignment, transfer, conveyance and delivery of the Shares by the
Seller to the Buyer, and in reliance upon the representations,
warranties and covenants made herein by the Seller, the Buyer shall
make payment in the aggregate amount of thirteen million eight hundred
thirteen thousand four hundred eighty dollars ($13,813,480) (the
"PURCHASE PRICE") payable in the voting stock the Buyer represented by
the issuance of 11,050,784 shares at a price of $1.25 per share, the
closing price of the stock of the Buyer as of August 31, 1998.

## ARTICLE II

2.1 THE CLOSING: The transfer and delivery of the shares to be made
pursuant to this Agreement (the "CLOSING") shall take place on January
29, 1999, or such other time and date as may be mutually agreed upon
in writing by the Seller and the Buyer (the "CLOSING DATE").

2.2 OBLIGATIONS OF SELLER AT CLOSING: At the Closing, the Seller shall
deliver to the Buyer stock certificates representing the Shares, duly
endorsed for transfer in blank, or accompanied by stock powers duly
hereof executed in blank, as described in Section 1.1.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby makes the following representations and warranties to the
Buyer, each of which shall be deemed material (and the Buyer, in executing,
delivering and consummating this Agreement, has relied and will rely upon the
correctness and completeness of each such representations and warranties
notwithstanding any independent investigation by the Buyer and/or the Buyer's
officers, directors, employees, representatives, agents and/or advisors):

3.1 ORGANIZATION AND EXISTENCE; AUTHORIZATION; ENFORCEABILITY.

(a) ORGANIZATION OF THE SELLER, GOOD STANDING. The Seller is a
corporation duly organized, validly existing and in good standing
under the laws of the Republic of Costa Rica with full corporate power
and authority to own, lease and operate its properties and assets and
conduct business in the manner in which such business is conducted.
The Seller has delivered to the Buyer true, correct and complete
copies of the Articles of Incorporation and By-laws of the Company.

(b) AUTHORIZATION. The Seller has full corporate power, authority
and capacity to enter into this Agreement and the agreements,
documents and instruments contemplated hereby and perform its
obligations hereunder and thereunder. The execution, delivery and
performance of this Agreement and all other agreements and

transactions  contemplated  hereby  have  been  duly  authorized  and
approved by the Board of Directors and the shareholders of the Seller,
if necessary, no other corporate

<PAGE>

proceedings  on  its  part  are  necessary  to  authorize  this  Agreement  and
the transactions contemplated hereby, and this Agreement constitutes a
valid and binding Agreement of Seller  enforceable in accordance  with
its terms.

(c)  NO  CONFLICTS  -  SELLER.  The  execution,  delivery  and
performance  of  this  Agreement  by  the  Seller  does  not  and  will  not
contravene,  conflict  with,  or  result  in  a  violation  or  breach  of  any
provision  of,  or  give  any  person  or  entity  the  right  to  declare  a
default or exercise any remedy under, or to accelerate the maturity or
performance  of,  or  to  cancel,  terminate  or  modify  any  agreement,
indenture,  mortgage,  deed  of  trust  or  other  instrument  to  which  the
Seller is a party or to which the assets of the Seller are bound.

3.2  LITIGATION.  To  the  best  of  the  Seller's  knowledge,  there  is  no
litigation  for  other  actions,  suits,  proceedings  or  investigations
pending,  at  law  or  in  equity,  or  before  any  governmental  department,
commission,  board,  agency  or  instrumentality,  or,  to  the  best  of  the
Seller's  knowledge,  threatened  against.  To  the  best  of  the  Seller's
knowledge,  no  event  has  occurred  or  circumstance  exists  that  may  give
rise or serve as the basis for commencement of any such action,  suit,
investigation or other proceeding.

3.3  FINANCIAL  STATEMENTS.  The  Seller  has  furnished  the  balance  sheets
for  the  Company  as  of  June  30,  1998,  together  with  the  related
unaudited  income  statements,  unaudited  statements  of  stockholder's
equity and statements of changes in financial  position for the fiscal
years  ending  September  30,  1997,  in  each  case  including  the  notes
thereto,  if  any  (collectively,  the  "Financial  Statements").  The
Company's  balance  sheets  (including  the  notes  thereto)  are  true  and
complete, and fairly present the financial condition of the Company as
of  the  respective  dates  thereof,  and  the  other  financial  statements
referred to herein  (including the notes  thereto)  fairly present the
results of operations  and the  financial  position of the Company for
the respective  fiscal  periods or as of the respective  dated therein
set  forth.  Each  of  such  statements  (including  the  notes  thereto)  has
been  prepared  in  accordance  with  United  States  generally  accepted
accounting  principles  consistently  applied,  and  do  not  and  will  not
fail to disclose any material,  extraordinary or out-of-period  items.
The books  and  records  of  the  Company  have  been,  and  are  being,
maintained in all respects in  accordance  with  applicable  legal  and
accounting requirements and reflect only actual transactions,  and the
Financial  Statements  have  been  prepared  in  accordance  with  such  books
of account and records.

3.4  ABSENCE  OF  CERTAIN  CHANGES  OR  EVENTS.  There  has  not  been  any
adverse  change  in  the  business,  operations,  properties,  assets  or
financial  condition  of  the  Company  from  that  described  in  the
Financial  Statements,  and  as  of  September  30,  1998.  No  fact  or
condition  of  any  character  exists  or  will  exist  on  the  Closing  Date
that  the  Seller  believes  will  cause  such  an  adverse  change  in  the
future  as  a  result  of  occurrences,  acts  or  omissions  prior  to  the
Closing Date.

<PAGE>

3.5 TAX  MATTERS.  The  Company  has  duly  filed  with  the  appropriate
governmental  agencies  all  information  returns,  tax  returns  and  reports
required by any jurisdiction to be filed by it on or prior to the date
hereof  (including,  without  limitation,  estimated  tax  returns  and
returns  with  respect  to  employee  or  employment-related  taxes).  Such
returns  are  accurate  and  complete  in  all  respects.  The  Company  has
duly  paid  all  taxes,  assessments,  fees,  penalties,  interest  and  other
governmental  charges  that  have  been  incurred  or  are  due  or  claimed  to
be  due  from  it  by  any  federal,  state,  local,  foreign  or  other  taxing
authorities  on  or  prior  to  the  date  of  this  Agreement  (including,

http://www.sec.gov/Archives/edgar/data/78966t/0001003aaf2c99-0t

without limitation, those due in respect to its properties, income, business, capital stock, deposits, licenses, sales, payroll, unemployment insurance, retirement, social security and occupational disability, as applicable). To the extent that any taxes may be due from the Company for any period prior to the Closing, such taxes will have been paid prior to the Closing Date. There are no tax liens of any kind or nature upon the properties or assets of the Company, and there are no disputes pending or claims asserted for taxes upon the Company or with respect to any of the assets of the Company. No income, excise, sales and/or federal, state, local, foreign or other tax returns are currently being audited by the appropriate taxing authorities, and all prior audits have been concluded and resolved.

3.6 PROPERTY-TITLE AND LEASES. The Company has good, valid and marketable title, free and clear of any and all liens, claims, encumbrances, charges, defaults, equities, assessments, rights of way, building or use restrictions, exceptions, variances or other limitations of whatever kind or character, except as disclosed to Buyer, to all of the real property and all other property owned by it, except property and assets disposed of in the ordinary course of business in accordance with the terms of this Agreement and for no less than fair market value. All buildings, fixtures, equipment and other property and assets held under leases or subleases by the Company with third parties are held under valid instruments enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy laws. The Company is the lessee or sub-lessee in possession under each lease or sublease to which it is a lessee or sub-lessee. All rentals due by the Company under each such lease or sublease have been paid, and there is no default or any event or condition which, with the giving of notice, lapse of time or occurrence or any further event or condition, would become a default under any such lease or sublease, and the Company is entitled to possession and quiet enjoyment of all such leased properties in accordance with the terms of such instruments. All operating facilities, buildings, furniture, equipment and other tangible property owned or used by the Company are in good operating condition and repair. Such tangible properties and all fixtures and improvements to real property owned or leased by the Company, and the use thereof, conform in all respects with all applicable building, zoning, environmental and other requirements, and do not materially encroach in any respect on property of others. All necessary occupancy and other certificates and permits for the occupancy and lawful use thereof and of the equipment and furnishings therein have been issued and are in full force and effect and no current use of any assets of the Company is dependent on a nonconforming use or other permit which materially limit the Company's use thereof.

<PAGE>

3.7 RECEIVABLES. The Company shall not have accounts payable other than the accounts disclosed to Buyer by Seller, and shall not have accounts receivable other than the ones disclosed to Buyer by Seller, nor in excess of an amount to be determined subsequent to the Buyer's due diligence and satisfactory to the Buyer. All accounts and notes receivable reflected in, or arising since the date of the most recent balance sheet, are included in the Financial Statements, all of which are owned by the Company and have either been collected or are collectible and will be collected in the ordinary course of business. None of such receivables are subject to any right of rescission.

3.8 INSURANCE. The Company maintains insurance policies and bonds in force in such amounts and against such liabilities and hazards as are customarily maintained by companies engaged in a business similar to its business. The Company is not liable for any material retroactive premium adjustments. All premiums due on such policies have been paid and all such policies are enforceable and in full force and effect, and the Company has not received any notice of premium increases or cancellations.

3.9 INTANGIBLE PERSONAL PROPERTY. The Company validly holds and possesses all patents, trademarks, service marks, copyrights, trade or

http://www.sec.gov/Archives/edgar/data/789881/0001035802-99-0

corporate names and licenses (collectively, "INTANGIBLE RIGHTS") which are required and necessary for the Company to conduct its business as presently conducted. The Company is the sole and exclusive owner of, and has the unrestricted right to use, each of the Intangible Rights. No claims or demands have been asserted against the Company with respect to any of the Intangible Rights and no proceedings have been instituted, are pending or have been threatened which challenge the rights of the Company with respect thereto.

3.10 COMPLIANCE WITH LAWS. The Company has conducted and is conducting its business in compliance with all applicable legal requirements. Additionally, the Company has not been and is not in violation of any permit, authorization, concession, agreement, contract, corporate document or other legally enforceable obligation.

3.11 NO MISREPRESENTATIONS. None of the information contained in the representations and warranties set forth in this Agreement, or in any of the documents, certificates or instruments delivered or to be delivered to any other party prior to or after the execution hereof as required or permitted by any provision of this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading as of the date hereof and as of the Closing.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE BUYER

To induce the Seller to enter into this Agreement and to consummate the sale of the Shares, the Buyer represents, warrants, covenants and agrees as follows:

<PAGE>

4.1 ORGANIZATION AND EXISTENCE: AUTHORIZATION; ENFORCEABILITY.

(a) ORGANIZATION OF THE COMPANY; GOOD STANDING. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, with full corporate power and authority to own, lease or operate its properties and assets and conduct its business a the manner in which it is currently conducted. The Buyer has the corporate power and authority, will take all the actions necessary and will obtain all necessary permits and authorizations, if applicable, in order to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

(b) AUTHORIZATION, ETC. The Buyer has full corporate power, authority and capacity to enter into this Agreement and to carry out the transactions contemplated hereby. The Board of Directors of the Buyer has duly authorized and approved the execution, delivery and performance of this Agreement, and the other agreements and transactions contemplated hereby, and if other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement and the transactions, contemplated hereby, will be obtained before the Closing Date.

(c) ENFORCEMENT, ETC. This Agreement is a valid and binding agreement of the Buyer enforceable in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, fraudulent transfer, reorganization moratorium and similar laws of general applicability relating to or affecting creditor's rights and to general equity principles. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Buyer and any successor of the Buyer by way of reorganization, merger, or consolidation and any assignee of all or substantially all of its business and assets.

(d) NO CONFLICT. The execution, delivery and performance of this Agreement by the Buyer does not and will not violate or constitute a breach of or default under any legal requirement or order of any governmental entity to which the Buyer is subject or under any agreement or instrument of the Buyer, or to which the Buyer is subject

· - or is a party or by which the Buyer is otherwise bound.

### ARTICLE V

### CERTAIN AGREEMENTS AND COVENANTS OF THE PARTIES

Each and every obligation of the Buyer under this Agreement shall be subject to the satisfaction by the Seller, on or before the Closing Date, of each of the following conditions unless waived in writing by the Buyer:

<PAGE>

5.1 ORDINARY COURSE. From the date hereof until January 31, 1999, unless the prior written consent of the Buyer is first obtained, the Seller will use its best efforts to preserve the value of the Company's assets and the business operations of the Company, to preserve the goodwill of customers and others having business relations with the Company, to maintain its properties in good repair, working order and condition, to comply with all laws applicable to it and the conduct of its business, to keep in force all licenses, permits and authorizations held by the Company necessary or desirable for the conduct of the Company's business, to keep in full force and effect at not less than their present limits, all policies of insurance, and to make no material change in the customary terms and conditions of such insurance policies.

5.2 NOTICE; REPRESENTATIVE. Seller will promptly give written notice to Buyer upon becoming aware of any event or the impending or threatened occurrence of any event which would cause or constitute a breach of any of its representations and warranties contained or referred to in this Agreement, and will use its best efforts to prevent the same or remedy the same promptly. The Seller shall promptly notify the Buyer of any material change in the normal course of business, operation or properties of the Company, or of any governmental complaints, investigations or hearings (or communications indicating that the same may be contemplated), or the institution or threat of litigation, and shall keep the Buyer fully informed of any and all such events.

5.3 ACTIONS; FURTHER ASSURANCES. Subject to the terms and conditions of this Agreement, the Seller shall (i), take all steps that are within its power to cause to be fulfilled those of the conditions precedent to Buyer's obligations to consummate the transactions contemplated hereby that are dependent upon Seller's actions, and (ii) use its best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated by this Agreement and not to take any actions which would be advise to such result. If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of any such agreements, Seller or the proper agents of Seller shall take all such necessary action. In addition, the Seller and the Company shall at all times cooperate with the Buyer to assist them in obtaining refunds, due the Company as a result of any tax benefits granted to the Company.

5.4 NON-SOLICITATION. The Seller shall not take any actions to seek, encourage, solicit or support any inquiry, proposal, expression of interest or offer from any other person or entity in connection with or with respect to an acquisition, combination or similar transaction, involving the Company and/or the Shares or a substantial portion of the assets of the Company, and the Seller will immediately inform the Buyer of the existence of any such inquiry, proposal, expression of interest or offer and shall not, without the prior written consent of the Buyer, furnish any information to or participate in any discussions or negotiations with, any other entity, person or group (other than the Buyer and its agents and representatives) regarding same. Neither the Seller nor the Company shall accept any inquiry, proposal, expression of interest or offer, execute any agreement, or enter into or consummate any transaction with respect to any of the

<PAGE>

foregoing and the Seller shall take all actions necessary to ensure
that the Company does not take any such action.

### ARTICLE VI

### CONDITIONS TO THE OBLIGATIONS OF THE BUYER

Each and every obligation of the Buyer under this Agreement shall be subject to
the satisfaction by the Seller and the Company, on or before the Closing Date,
of each of the following conditions unless waived in writing by the Buyer:

6.1 REPRESENTATIONS AND WARRANTIES. The representations and warranties
of the Seller and the Company contained in Section III and elsewhere
in this Agreement and all information contained in any exhibit,
certificate, schedule or attachment hereto or in any writing delivered
by or on behalf of, the Seller or the Company to the Buyer, shall be
true and correct when made, and shall be true in all material respects
at and as of the Closing Date. The Seller and the Company shall have
performed and complied with all agreements, covenants and conditions
and shall have made all deliveries required by this Agreement to be
performed, delivered and complied with by them prior to the Closing
Date.

6.2 CONSENT AND APPROVALS. On or before January 31, 1999, the Seller
and/or the Company (as the case may be) shall have received in writing
all required approvals, consents or acquiescence from all governmental
and regulatory agencies, secured parties or other third parties with
respect to the transactions contemplated by this Agreement. Buyer and
Seller may agree in writing an another closing date if and consents or
approvals are pending at the Closing Date.

6.3 NO PENDING OR THREATENED LEGAL CLAIM. No (i) litigation of any
kind shall be pending or threatened; (ii) preliminary or permanent
injunction or other order issued by any court of competent
jurisdiction or by any federal or state governmental or regulatory
body; or (iii) statute, rule, regulation or executive order
promulgated or enacted by any federal or state governmental authority
after the date of this Agreement, which has or could have a material
adverse effect on the business, properties, prospects or condition,
financial or otherwise, of the Company, prohibits the consummation of
the transactions contemplated by this Agreement, or affects in any way
the Seller's right, title and interest to the Shares or the Seller's
ability to transfer the Shares to the Buyer in accordance with the
terms of this Agreement, shall be in effect pending or threatened.

6.4 NO MATERIAL ADVERSE CHANGE. No material adverse change in the
operations, the business, the financial condition or prospects of the
Company shall have occurred, no fact shall have arisen which has or
reasonably could be expected to have a material adverse effect on the
Company, or its properties, assets or the consummation of the
transactions contemplated hereby, in each case in the sole and
absolute discretion of the Buyer.

<PAGE>

6.5 DUE DILIGENCE. The Seller shall have provided Buyer under the
terms and conditions of the letter of intent and confidentiality
agreement (the "Agreements") with access to the Company's business,
records and any information which the Buyer deemed necessary, in its
sole and absolute discretion, to conduct a satisfactory due diligence
examination, pursuant to which the Buyer may, among other things, has,
(i) evaluated the Company, its assets and liabilities, (ii) satisfied
itself, in its sole and absolute discretion, that the Company's assets
are being received in a satisfactory condition, (iii) satisfied
itself, in its sole and absolute discretion, that the Company does not
have any debts, liabilities or other obligations, whether absolute,
contingent or otherwise which have not been disclosed in writing by
the Seller, or are reflected in the financial statements, and (iv)
satisfied itself, in its sole and absolute discretion, that the
Company's licenses, permits and authorizations required for the
Company to operate its business are valid. Such due diligence was

completed by the Buyer  fifteen (15) days before the execution of this
Agreement (the "Due Diligence Period").

6.6 SHARE  CERTIFICATES  AND OTHER  DOCUMENTS.  The Seller  shall have
delivered  to the Buyer  stock  certificates  evidencing the Shares duly
endorsed for transfer or  accompanied by stock powers duly executed in
blank.  The Buyer shall have  received  from the Seller all such other
documents   and   instruments,   duly  executed   where   required  or
appropriate,  as it may  reasonably  request  in  connection  with the
transactions  contemplated by this Agreement,  as set forth in Section
1.1.

6.7 OPINION OF SELLER'S  COUNSEL.  The Seller shall have  delivered an
opinion of counsel in a form reasonably satisfactory to the Buyer.

6.8 CORPORATE  ACTION.  The Company's  Board of Directors  shall have
approved  the transactions  contemplated  by this Agreement  if such
approval is necessary under the Company's Articles of Incorporation or
By-laws.

6.9 FAIRNESS OPINION.  The Company shall have received an opinion from
a financial advisor stating that the transactions contemplated by this
Agreement are fair to the stockholders of the company from a financial
prospective.

6.10 STOCKHOLDER APPROVAL.  The stockholders of the Company shall have
approved this Agreement at a meeting of the  stockholders  or pursuant
to a consent solicitation.

ARTICLE VII

CONDITIONS TO THE OBLIGATION OF THE SELLER

Each and every obligation of the Seller under this Agreement shall be subject to
the  satisfaction  by the Buyer,  on or before  January 31, 1998, of each of the
following conditions, unless waived in writing by the Seller:

<PAGE>

7.1 REPRESENTATIONS AND WARRANTIES. The representations and warranties
of the Buyer  contained in Section IV and elsewhere in this  Agreement
and all information contained in any exhibit, certificate, schedule or
attachment  hereto or in any writing  delivered by or on behalf of the
Buyer to the Seller shall be true and correct when made,  and shall be
true in all material respects at and as of the Closing Date. The Buyer
shall have performed and complied with all agreements,  covenants, and
conditions  and  shall  have  made  all  deliveries  required  by this
Agreement to be  performed,  delivered and complied with by them prior
to the Closing Date.

7.2 COVENANTS PERFORMED. All of the covenants, terms and conditions of
this  Agreement to be complied  with and  performed by the Buyer on or
before the Closing Date shall have been duly complied and performed.

7.3 PURCHASE  PRICE.  The Buyer shall have delivered to the Seller the
Purchase Price in accordance with Section 1.1 of this Agreement.

7.4 FAIRNESS OPINION.  The Company shall have received an opinion from
a financial advisor stating that the transactions contemplated by this
Agreement are fair to the stockholders of the company from a financial
prospective.

7.5 STOCKHOLDER  APPROVAL.  The stockholders of the Company shall have
approved this Agreement at a meeting of the  stockholders  or pursuant
to a consent solicitation.

ARTICLE VIII

INDEMNIFICATION

8.1 OBLIGATIONS OF BUYER.  The Buyer agrees to defend,  indemnify and
hold  harmless  Seller  from,  against  and in  respect of any and all
demands,  claims,  actions or causes of action,  losses,  liabilities,
assessments  deficiencies,  taxes,  cost and expenses,

including, without limitation, interest, penalties and reasonable
attorney's fees and expenses (collectively "Claims"), asserted
against, imposed upon or paid, incurred or suffered by Seller as a
result of, arising from, in connection with or incident to any
material breach or material inaccuracy of any representation,
warranty, covenant or agreement of the Buyer in this Agreement or in
any document, certificate or other instrument related hereto.

8.2 OBLIGATIONS OF SELLER. Seller agrees to defend, indemnify and hold
harmless the Buyer from, against and in respect of any and all
demands, claims actions or causes of action, losses, liabilities,
damages, assessments, deficiencies, taxes, cost and expenses,
including, without limitation, interest, penalties and reasonable
attorney's fees and expenses (collectively "Claims"), asserted
against, imposed upon or paid, incurred or suffered by the Buyer as a
result of, arising from, in connection with, or incident to (i) any
breach or inaccuracy of any representation, warranty, covenant or
agreement of Seller in this Agreement, or in any document, certificate
or other instrument related

<PAGE>

hereto, (ii) the inability, failure or refusal of Seller to act in
good faith in connection with this Agreement, or the transactions,
agreements, documents and instruments delivered herewith or
contemplated hereby, at any time from the date of this Agreement until
the later in time of (a) the Closing Date, (b) the end of the Due
Diligence Period and (c) which as of the Closing Date have not been
undisclosed to the Buyer in writing.

8.3 INDEMNIFICATION PROCEDURE. A party or parties hereto agreeing to
be responsible for or to indemnify against any matter pursuant to this
Agreement is referred to herein as the "Indemnifying Party" and the
other party or parties claiming indemnification hereunder is referred
to as the "Indemnified Party". An Indemnified Party under this
Agreement shall give prompt written notice to the Indemnifying Party
of any liability which might give rise to a claim for indemnity under
this Agreement. As to any claim by a third party, the Indemnified
Party may participate in the defense, compromise or settlement of any
such matter through the Indemnified Party's own attorneys and at the
Indemnifying Party's own expense; each of the indemnifying and the
Indemnified Party shall provide such cooperation and such reasonable
access to its books, records and properties as the other party shall
reasonable request with respect to any such matter; and the parties
hereto agree to cooperate with each other in order to ensure the
proper and adequate defense thereof. The Buyer may setoff against the
amount of any other payments due to Seller hereunder or otherwise,
including, without limitation the Note, any and all amounts, due to
the Buyer pursuant to any and all claims that the Buyer may have
against Seller hereunder including, without limitation, with respect
to the indemnification of the Buyer hereunder by Seller.

An Indemnifying Party shall not make any settlement of any claims
without the written consent of the Indemnified Party which consent
shall not be unreasonably withheld. Without limiting the generality of
the foregoing, it shall not be deemed unreasonable to withhold consent
to a settlement involving injunctive or other equitable relief against
the Indemnified Party or its assets, employees or business.

In a case where responsibility for a matter giving rise to a
claim for indemnification is shared by the parties, any of the parties
may elect to relieve the other of its obligations of indemnification
with respect to such matter and, subject to the provisions of this
section, such electing party may thereupon assume full control of the
resolution of such matter. If such election is not made, control shall
also be shared.

ARTICLE IX

SURVIVAL OF TERMS; REPRESENTATIONS

9.1 SURVIVAL. The representations and warranties contained herein
shall be true and correct as of January 31, 1999 as though such
representations and warranties were made at and as of the Closing

'consummation of all of the transactions contemplated by this Agreement.

<PAGE>

## ARTICLE X

### MISCELLANEOUS PROVISIONS

10.1 BINDING AGREEMENT. This Agreement may not be transferred, assigned, pledged or hypothecated all or in part by any party hereto without the prior written consent of all the other parties hereto. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective assigns and successors in interest. No other person shall acquire or have any right under or by virtue of this Agreement.

10.2 GOVERNING LAW. This Agreement, the rights and obligations of the parties, and any other claims or disputes relating in anyway thereto will be governed by and construed in accordance with the laws of the State of Florida.

10.3 COUNTERPARTS, HEADINGS, ETC. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The headings herein are for convenience of reference only and shall not be deemed a part of this Agreement.

10.4 NOTICES. Any notice or other communication required or permitted hereunder shall be deemed validly given, made or served if in writing and if delivered in person or sent by facsimile transmission or registered or certified mail to the intended recipient at the following address or to such other address or number as shall be furnished in writing by any such party to the other:

If to the Seller:          Calixto Chaves
                           Inversiones La Ribera, S.A.
                           400 meters west of
                           National Panasonic Plant,
                           San Rafael Alajuela

If to the Buyer:           Calixto Chaves
                           95 Merrick Way,
                           Suite 507,
                           Coral Gables,
                           Florida, 33134

10.5 AMENDMENT; SEVERABILITY. This Agreement may be amended only by an agreement in writing signed by the parties hereto. In case any provision of this Agreement shall be held invalid, illegal or unenforceable by any court, the validity, legality and enforceability of the remaining provisions will not be affected or impaired thereby.

<PAGE>

10.6 ARBITRATION. Any dispute arising in connection with this Agreement shall be exclusively settled by binding arbitration in the Spanish language in Miami, Florida, in accordance with the Rules of Arbitration and Conciliation of the International Chamber of Commerce. Notwithstanding any provision in these rules, the arbitration panel in any such arbitration proceeding shall consist of three arbitrators. One arbitrator will be designated by Buyer, another arbitrator will be designated by Seller and the third arbitrator will be a person mutually agreed upon by Buyer and Seller. The arbitration panel shall render its decision in writing, and such written decision and conclusions with respect to the disputes so settled shall be final and binding on the parties to the arbitration proceeding and confirmation and enforcement of the awards so on the parties to the arbitration proceeding and confirmation and enforcement of the awards so rendered may be obtained and entered in any court having jurisdiction thereof. Each of Buyer and Seller hereby irrevocably submits to the

http://www.sec.gov/Archives/edgar/data/70900/000103300204-99-06

· jurisdiction of any such court for purposes of enforcement of the arbitration panel's decision.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

SELLER:

BY:                /s/ CALIXTO CHAVES
              --------------------------------------
              CALIXTO CHAVES
              PRESIDENT
              INVERSIONES LA RIBERA, S.A.

BY:                /s/ CALIXTO CHAVES
              --------------------------------------
              CALIXTO CHAVES
              PRESIDENT
              COSTA RICA INTERNATIONAL, INC.

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of Report (date of earliest event reported) December 7, 1999
------------------------------------------------------------------------

RICA FOODS, INC. (formerly known as Costa Rica International, Inc.)
------- ---------------------------------------------------------------
(Exact name of registrant as specified in its charter)


NEVADA
--------
(State or other jurisdiction of incorporation)

0-18222                                87-0432572
------------------------------------------------------------------------
(Commission File Number)        (IRS Employer Identification No.)

95 MERRICK WAY, SUITE 507
CORAL GABLES, FLORIDA 33134
------------------------------------------------------------------------
(Address of principal executive offices) (Zip Code)


(305) 476-1757
---------------
(Registrant's telephone number, including area code)


<PAGE>


ITEM 2.  ACQUISITION OR DISPOSITION OF ASSETS

On December 7, 1999, Rica Foods, Inc. (the "Company" or the "Registrant")
consummated the acquisition of 100% of the total outstanding common stock of
Corporacion Pipasa, S.A., a Costa Rican corporation ("Pipasa"), by the transfer
from Inversiones La Ribera, S.A., a Costa Rican corporation ("Ribera"), owned by
Calixto Chaves, the Company's president, chief executive officer and director,
as well as a major shareholder of the Company, of 40.44% or 1,840,000 shares of
common stock of Pipasa (the "Shares") pursuant to that Stock Purchase Agreement
dated as of September 28, 1998, and amended on November 9, 1998 by and between
the Company and Ribera (the "Agreement"). The Company has issued to Ribera, in
exchange for the Shares, a total of 3,683,595 shares of Company common stock.
The Agreement is included as an exhibit to this Current Report on Form 8-K and
incorporated herein by reference.

With the transfer of the Shares and such transfer reflected in the stock ledger
of Pipasa, the Company has increased the ownership interest reflected in its
financial statements, to 100% ownership of Pipasa, in comparison to a 59.56%
majority interest that was being shown for the fiscal year 1999.

Pipasa is Costa Rica's largest poultry producer and marketer, comprising
approximately a 50% share of that country's poultry market.

ITEM 7.  FINANCIAL STATEMENTS, PRO FORMA FINANCIAL
         INFORMATION AND EXHIBITS

(a)     FINANCIAL STATEMENTS OF BUSINESSES ACQUIRED

        As permitted by Item 7(a)(4) of Form 8-K, the Registrant intends to
        file the required financial statements of Pipasa by amendment to this
        Current Report on Form 8-K no later than 60 days after December 16,
        1999.

(b)     PRO FORMA FINANCIAL INFORMATION



http://www.sec.gov/Archives/edgar/data/789881/0001035802-99-000...

As permitted by Item 7(b)(2) of Form 8-K, the Registrant intends to file the required pro forma financial information by amendment to this Current Report on Form 8-K no later than 60 days after December 16, 1999.

(c)      EXHIBIT

2.1 Stock Purchase Agreement, dated as of September 28, 1998, and amended on November 9, 1998, by and between the Company and Inversiones La Ribera, S.A.

<PAGE>

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

RICA FOODS, INC.

Dated:   December 16, 1999        By:    /s/ Calixto Chaves
         --------------------            --------------------------------------
                                         CALIXTO CHAVES
                                         President, Chief Executive Officer,
                                         and Chairman

<PAGE>

## EXHIBIT INDEX

EXHIBIT      DESCRIPTION

2.1          Stock Purchase Agreement, dated as of September 28, 1998, and
             amended on November 9, 1998, by and between the Company and
             Inversiones La Ribera, S.A.

<PAGE>

## EXHIBIT 2.1

### STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement") is made and entered into as of September 28, 1998, and amended as of November 9, 1998, by and between RICA FOODS, INC., a corporation organized under the laws of the State of Nevada (the "BUYER"), and INVERSIONES LA RIBERA, S.A., a corporation organized under the laws of the Republic of Costa Rica (the "SELLER").

### WITNESSETH:

WHEREAS, the Seller owns forty point forty four percent (40.44%) of the issued and outstanding shares of the common stock of Corporacion Pipasa, S.A. (the "COMPANY").

WHEREAS, the Company has authorized a total of five million, fifty thousand (5,050,000) shares of common stock, par value of one thousand (/cents/ 1.000) colones per share, of which four million, five hundred and fifty thousand ($4,550,000) shares are issued and outstanding; and

WHEREAS, the Seller desires to sell, convey, transfer, assign and deliver to the Buyer one million eight hundred forty thousand (1,840,000) shares of common stock of the Company, issued and outstanding, which represent forty point forty-four percent (40.44%) of the issued and outstanding shares of common stock of the Company, all of which are owned by the Seller (collectively, the "Shares"), upon and subject to the terms, covenants and conditions herein set forth. Upon the transfer of the Shares to the Buyer, the Buyer shall own one hundred percent (100%) of the total outstanding common stock of the Company.

NOW THEREFORE, for and in consideration of the premises and the mutual covenants

herein contained and other good and valuable consideration, the receipt and
sufficiency of which are hereby conclusively acknowledged, the parties hereto
hereby agree as follows:

### ARTICLE I

1.1 SALE AND PURCHASE OF THE SHARES. Subject to the terms of this
Agreement, the Seller agrees to sell, assign, transfer, convey and
deliver the Shares to the Buyer, free and clear of any lien, security
interest, encumbrance, restriction, and claim of any kind whatsoever,
and the Buyer agrees to purchase the Shares from the Seller. The sale,
assignment, transfer, conveyance and delivery by the Seller of the
Shares to the Buyer shall be effected on or before January 31, 1999 by
the Seller's delivery to the Buyer of the stock certificates
evidencing the shares duly endorsed for transfer or accompanied by
stock powers duly executed in blank, this agreement signed before a
Notary Public under Costa Rican law, as necessary to effectively vest
in the Buyer all of the right, title and interest of the Seller in and
to the Shares. The parties may mutually agree in writing, and pursuant
to the mutual benefits provided by this Agreement, to the delivery by
the Buyer to the Seller of the stock certificates of the Company after
January 31, 1999, if so required and duly justified.

<PAGE>

1.2 PURCHASE PRICE AND PAYMENT: In consideration of the sale,
assignment, transfer, conveyance and delivery of the Shares by the
Seller to the Buyer, and in reliance upon the representations,
warranties and covenants made herein by the Seller, the Buyer shall
make payment in the aggregate amount of thirteen million eight hundred
thirteen thousand four hundred eighty dollars ($13,813,480) (the
"PURCHASE PRICE") payable in the voting stock the Buyer represented by
the issuance of 11,050,784 shares at a price of $1.25 per share, the
closing price of the stock of the Buyer as of August 31, 1998.

### ARTICLE II

2.1 THE CLOSING: The transfer and delivery of the shares to be made
pursuant to this Agreement (the "CLOSING") shall take place on January
29, 1999, or such other time and date as may be mutually agreed upon
in writing by the Seller and the Buyer (the "CLOSING DATE").

2.2 OBLIGATIONS OF SELLER AT CLOSING: At the Closing, the Seller shall
deliver to the Buyer stock certificates representing the Shares, duly
endorsed for transfer in blank, or accompanied by stock powers duly
hereof executed in blank, as described in Section 1.1.

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby makes the following representations and warranties to the
Buyer, each of which shall be deemed material (and the Buyer, in executing,
delivering and consummating this Agreement, has relied and will rely upon the
correctness and completeness of each such representations and warranties
notwithstanding any independent investigation by the Buyer and/or the Buyer's
officers, directors, employees, representatives, agents and/or advisors):

3.1 ORGANIZATION AND EXISTENCE; AUTHORIZATION; ENFORCEABILITY.

(a) ORGANIZATION OF THE SELLER, GOOD STANDING. The Seller is a
corporation duly organized, validly existing and in good standing
under the laws of the Republic of Costa Rica with full corporate power
and authority to own, lease and operate its properties and assets and
conduct business in the manner in which such business is conducted.
The Seller has delivered to the Buyer true, correct and complete
copies of the Articles of Incorporation and By-laws of the Company.

(b) AUTHORIZATION. The Seller has full corporate power, authority
and capacity to enter into this Agreement and the agreements,
documents and instruments contemplated hereby and perform its
obligations hereunder and thereunder. The execution, delivery and
performance of this Agreement and all other agreements and

transactions contemplated hereby have been duly authorized and
approved by the Board of Directors and the shareholders of the Seller,
if necessary, no other corporate

<PAGE>

proceedings on its part are necessary to authorize this Agreement and
the transactions contemplated hereby, and this Agreement constitutes a
valid and binding Agreement of Seller enforceable in accordance with
its terms.

(c) NO CONFLICTS - SELLER. The execution, delivery and
performance of this Agreement by the Seller does not and will not
contravene, conflict with, or result in a violation or breach of any
provision of, or give any person or entity the right to declare a
default or exercise any remedy under, or to accelerate the maturity or
performance of, or to cancel, terminate or modify any agreement,
indenture, mortgage, deed of trust or other instrument to which the
Seller is a party or to which the assets of the Seller are bound.

3.2 LITIGATION. To the best of the Seller's knowledge, there is no
litigation for other actions, suits, proceedings or investigations
pending, at law or in equity, or before any governmental department,
commission, board, agency or instrumentality, or, to the best of the
Seller's knowledge, threatened against. To the best of the Seller's
knowledge, no event has occurred or circumstance exists that may give
rise or serve as the basis for commencement of any such action, suit,
investigation or other proceeding.

3.3 FINANCIAL STATEMENTS. The Seller has furnished the balance sheets
for the Company as of June 30, 1998, together with the related
unaudited income statements, unaudited statements of stockholder's
equity and statements of changes in financial position for the fiscal
years ending September 30, 1997, in each case including the notes
thereto, if any (collectively, the "Financial Statements"). The
Company's balance sheets (including the notes thereto) are true and
complete, and fairly present the financial condition of the Company as
of the respective dates thereof, and the other financial statements
referred to herein (including the notes thereto) fairly present the
results of operations and the financial position of the Company for
the respective fiscal periods or as of the respective dated therein
set forth. Each of such statements (including the notes thereto) has
been prepared in accordance with United States generally accepted
accounting principles consistently applied, and do not and will not
fail to disclose any material, extraordinary or out-of-period items.
The books and records of the Company have been, and are being,
maintained in all respects in accordance with applicable legal and
accounting requirements and reflect only actual transactions, and the
Financial Statements have been prepared in accordance with such books
of account and records.

3.4 ABSENCE OF CERTAIN CHANGES OR EVENTS. There has not been any
adverse change in the business, operations, properties, assets or
financial condition of the Company from that described in the
Financial Statements, and as of September 30, 1998. No fact or
condition of any character exists or will exist on the Closing Date
that the Seller believes will cause such an adverse change in the
future as a result of occurrences, acts or omissions prior to the
Closing Date.

<PAGE>

3.5 TAX MATTERS. The Company has duly filed with the appropriate
governmental agencies all information returns, tax returns and reports
required by any jurisdiction to be filed by it on or prior to the date
hereof (including, without limitation, estimated tax returns and
returns with respect to employee or employment-related taxes). Such
returns are accurate and complete in all respects. The Company has
duly paid all taxes, assessments, fees, penalties, interest and other
governmental charges that have been incurred or are due or claimed to
be due from it by any federal, state, local, foreign or other taxing
authorities on or prior to the date of this Agreement (including,

without limitation, those due in respect to its properties, income, business, capital stock, deposits, licenses, sales, payroll, unemployment insurance, retirement, social security and occupational disability, as applicable). To the extent that any taxes may be due from the Company for any period prior to the Closing, such taxes will have been paid prior to the Closing Date. There are no tax liens of any kind or nature upon the properties or assets of the Company, and there are no disputes pending or claims asserted for taxes upon the Company or with respect to any of the assets of the Company. No income, excise, sales and/or federal, state, local, foreign or other tax returns are currently being audited by the appropriate taxing authorities, and all prior audits have been concluded and resolved.

3.6 PROPERTY-TITLE AND LEASES. The Company has good, valid and marketable title, free and clear of any and all liens, claims, encumbrances, charges, defaults, equities, assessments, rights of way, building or use restrictions, exceptions, variances or other limitations of whatever kind or character, except as disclosed to

without limitation, those due in respect to its properties, income, business, capital stock, deposits, licenses, sales, payroll, unemployment insurance, retirement, social security and occupational disability, as applicable). To the extent that any taxes may be due from the Company for any period prior to the Closing, such taxes will have been paid prior to the Closing Date. There are no tax liens of any kind or nature upon the properties or assets of the Company, and there are no disputes pending or claims asserted for taxes upon the Company or with respect to any of the assets of the Company. No income, excise, sales and/or federal, state, local, foreign or other tax returns are currently being audited by the appropriate taxing authorities, and all prior audits have been concluded and resolved.

3.6 PROPERTY-TITLE AND LEASES. The Company has good, valid and marketable title, free and clear of any and all liens, claims, encumbrances, charges, defaults, equities, assessments, rights of way, building or use restrictions, exceptions, variances or other limitations of whatever kind or character, except as disclosed to Buyer, to all of the real property and all other property owned by it, except property and assets disposed of in the ordinary course of business in accordance with the terms of this Agreement and for no less than fair market value. All buildings, fixtures, equipment and other property and assets held under leases or subleases by the Company with third parties are held under valid instruments enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy laws. The Company is the lessee or sub-lessee in possession under each lease or sublease to which it is a lessee or sub-lessee. All rentals due by the Company under each such lease or sublease have been paid, and there is no default or any event or condition which, with the giving of notice, lapse of time or occurrence or any further event or condition, would become a default under any such lease or sublease, and the Company is entitled to possession and quiet enjoyment of all such leased properties in accordance with the terms of such instruments. All operating facilities, buildings, furniture, equipment and other tangible property owned or used by the Company are in good operating condition and repair. Such tangible properties and all fixtures and improvements to real property owned or leased by the Company, and the use thereof, conform in all respects with all applicable building, zoning, environmental and other requirements, and do not materially encroach in any respect on property of others. All necessary occupancy and other certificates and permits for the occupancy and lawful use thereof and of the equipment and furnishings therein have been issued and are in full force and effect and no current use of any assets of the Company is dependent on a nonconforming use or other permit which materially limit the Company's use thereof.

<PAGE>

3.7 RECEIVABLES. The Company shall not have accounts payable other than the accounts disclosed to Buyer by Seller, and shall not have accounts receivable other than the ones disclosed to Buyer by Seller, nor in excess of an amount to be determined subsequent to the Buyer's due diligence and satisfactory to the Buyer. All accounts and notes receivable reflected in, or arising since the date of the most recent balance sheet, are included in the Financial Statements, all of which are owned by the Company and have either been collected or are collectible and will be collected in the ordinary course of business. None of such receivables are subject to any right of rescission.

3.8 INSURANCE. The Company maintains insurance policies and bonds in force in such amounts and against such liabilities and hazards as are customarily maintained by companies engaged in a business similar to its business. The Company is not liable for any material retroactive premium adjustments. All premiums due on such policies have been paid and all such policies are enforceable and in full force and effect, and the Company has not received any notice of premium increases or cancellations.

3.9 INTANGIBLE PERSONAL PROPERTY. The Company validly holds and possesses all patents, trademarks, service marks, copyrights, trade or

corporate names and licenses (collectively, "INTANGIBLE RIGHTS") which
are required and necessary for the Company to conduct its business as
presently conducted. The Company is the sole and exclusive owner of,
and has the unrestricted right to use, each of the Intangible Rights.
No claims or demands have been asserted against the Company with
respect to any of the Intangible Rights and no proceedings have been
instituted, are pending or have been threatened which challenge the
rights of the Company with respect thereto.

3.10 COMPLIANCE WITH LAWS. The Company has conducted and is conducting
its business in compliance with all applicable legal requirements.
Additionally, the Company has not been and is not in violation of any
permit, authorization, concession, agreement, contract, corporate
document or other legally enforceable obligation.

3.11 NO MISREPRESENTATIONS. None of the information contained in the
representations and warranties set forth in this Agreement, or in any
of the documents, certificates or instruments delivered or to be
delivered to any other party prior to or after the execution hereof as
required or permitted by any provision of this Agreement, contains or
will contain any untrue statement of a material fact or omits or will
omit to state a material fact necessary to make the statements
contained herein or therein not misleading as of the date hereof and
as of the Closing.

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE BUYER

To induce the Seller to enter into this Agreement and to consummate the sale of
the Shares, the Buyer represents, warrants, covenants and agrees as follows:

<PAGE>

4.1 ORGANIZATION AND EXISTENCE: AUTHORIZATION; ENFORCEABILITY.

(a) ORGANIZATION OF THE COMPANY: GOOD STANDING. The Buyer is a
corporation duly organized, validly existing and in good standing
under the laws of the State of Nevada, with full corporate power and
authority to own, lease or operate its properties and assets and
conduct its business a the manner in which it is currently conducted.
The Buyer has the corporate power and authority, will take all the
actions necessary and will obtain all necessary permits and
authorizations, if applicable, in order to execute and deliver this
Agreement and to consummate the transactions contemplated hereby.

(b) AUTHORIZATION, ETC. The Buyer has full corporate power,
authority and capacity to enter into this Agreement and to carry out
the transactions contemplated hereby. The Board of Directors of the
Buyer has duly authorized and approved the execution, delivery and
performance of this Agreement, and the other agreements and
transactions contemplated hereby, and if other corporate proceedings
on the part of the Buyer are necessary to authorize this Agreement and
the transactions, contemplated hereby, will be obtained before the
Closing Date.

(c) ENFORCEMENT, ETC. This Agreement is a valid and binding
agreement of the Buyer enforceable in accordance with its terms,
subject, as to enforceability, to bankruptcy, insolvency, fraudulent
transfer, reorganization moratorium and similar laws of general
applicability relating to or affecting creditor's rights and to
general equity principles. This Agreement and all of the provisions
hereof shall be binding upon and inure to the benefit of the Buyer and
any successor of the Buyer by way of reorganization, merger, or
consolidation and any assignee of all or substantially all of its
business and assets.

(d) NO CONFLICT. The execution, delivery and performance of this
Agreement by the Buyer does not and will not violate or constitute a
breach of or default under any legal requirement or order of any
governmental entity to which the Buyer is subject or under any
agreement or instrument of the Buyer, or to which the Buyer is subject

or is a party or by which the Buyer is otherwise bound.

ARTICLE V

CERTAIN AGREEMENTS AND COVENANTS OF THE PARTIES

Each and every obligation of the Buyer under this Agreement shall be subject to the satisfaction by the Seller, on or before the Closing Date, of each of the following conditions unless waived in writing by the Buyer:

<PAGE>

5.1 ORDINARY COURSE. From the date hereof until January 31, 1999, unless the prior written consent of the Buyer is first obtained, the Seller will use its best efforts to preserve the value of the Company's assets and the business operations of the Company, to preserve the goodwill of customers and others having business relations with the Company, to maintain its properties in good repair, working order and condition, to comply with all laws applicable to it and the conduct of its business, to keep in force all licenses, permits and authorizations held by the Company necessary or desirable for the conduct of the Company's business, to keep in full force and effect at not less than their present limits, all policies of insurance, and to make no material change in the customary terms and conditions of such insurance policies.

5.2 NOTICE; REPRESENTATIVE. Seller will promptly give written notice to Buyer upon becoming aware of any event or the impending or threatened occurrence of any event which would cause or constitute a breach of any of its representations and warranties contained or referred to in this Agreement, and will use its best efforts to prevent the same or remedy the same promptly. The Seller shall promptly notify the Buyer of any material change in the normal course of business, operation or properties of the Company, or of any governmental complaints, investigations or hearings (or communications indicating that the same may be contemplated), or the institution or threat of litigation, and shall keep the Buyer fully informed of any and all such events.

5.3 ACTIONS; FURTHER ASSURANCES. Subject to the terms and conditions of this Agreement, the Seller shall (i), take all steps that are within its power to cause to be fulfilled those of the conditions precedent to Buyer's obligations to consummate the transactions contemplated hereby that are dependent upon Seller's actions, and (ii) use its best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated by this Agreement and not to take any actions which would be advise to such result. If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of any such agreements, Seller or the proper agents of Seller shall take all such necessary action. In addition, the Seller and the Company shall at all times cooperate with the Buyer to assist them in obtaining refunds, due the Company as a result of any tax benefits granted to the Company.

5.4 NON-SOLICITATION. The Seller shall not take any actions to seek, encourage, solicit or support any inquiry, proposal, expression of interest or offer from any other person or entity in connection with or with respect to an acquisition, combination or similar transaction, involving the Company and/or the Shares or a substantial portion of the assets of the Company, and the Seller will immediately inform the Buyer of the existence of any such inquiry, proposal, expression of interest or offer and shall not, without the prior written consent of the Buyer, furnish any information to or participate in any discussions or negotiations with, any other entity, person or group (other than the Buyer and its agents and representatives) regarding same. Neither the Seller nor the Company shall accept any inquiry, proposal, expression of interest or offer, execute any agreement, or enter into or consummate any transaction with respect to any of the

<PAGE>

http://www.sec.gov/Archives/edgar/data/78988/0001033802-99-000...

foregoing and the Seller shall take all actions necessary to ensure that the Company does not take any such action.

ARTICLE VI

CONDITIONS TO THE OBLIGATIONS OF THE BUYER

Each and every obligation of the Buyer under this Agreement shall be subject to the satisfaction by the Seller and the Company, on or before the Closing Date, of each of the following conditions unless waived in writing by the Buyer:

6.1 REPRESENTATIONS AND WARRANTIES. The representations and warranties of the Seller and the Company contained in Section III and elsewhere in this Agreement and all information contained in any exhibit, certificate, schedule or attachment hereto or in any writing delivered by or on behalf of, the Seller or the Company to the Buyer, shall be true and correct when made, and shall be true in all material respects at and as of the Closing Date. The Seller and the Company shall have performed and complied with all agreements, covenants and conditions and shall have made all deliveries required by this Agreement to be performed, delivered and complied with by them prior to the Closing Date.

6.2 CONSENT AND APPROVALS. On or before January 31, 1999, the Seller and/or the Company (as the case may be) shall have received in writing all required approvals, consents or acquiescence from all governmental and regulatory agencies, secured parties or other third parties with respect to the transactions contemplated by this Agreement. Buyer and Seller may agree in writing an another closing date if and consents or approvals are pending at the Closing Date.

6.3 NO PENDING OR THREATENED LEGAL CLAIM. No (i) litigation of any kind shall be pending or threatened; (ii) preliminary or permanent injunction or other order issued by any court of competent jurisdiction or by any federal or state governmental or regulatory body; or (iii) statute, rule, regulation or executive order promulgated or enacted by any federal or state governmental authority after the date of this Agreement, which has or could have a material adverse effect on the business, properties, prospects or condition, financial or otherwise, of the Company, prohibits the consummation of the transactions contemplated by this Agreement, or affects in any way the Seller's right, title and interest to the Shares or the Seller's ability to transfer the Shares to the Buyer in accordance with the terms of this Agreement, shall be in effect pending or threatened.

6.4 NO MATERIAL ADVERSE CHANGE. No material adverse change in the operations, the business, the financial condition or prospects of the Company shall have occurred, no fact shall have arisen which has or reasonably could be expected to have a material adverse effect on the Company, or its properties, assets or the consummation of the transactions contemplated hereby, in each case in the sole and absolute discretion of the Buyer.

<PAGE>

6.5 DUE DILIGENCE. The Seller shall have provided Buyer under the terms and conditions of the letter of intent and confidentiality agreement (the "Agreements") with access to the Company's business, records and any information which the Buyer deemed necessary, in its sole and absolute discretion, to conduct a satisfactory due diligence examination, pursuant to which the Buyer may, among other things, has, (i) evaluated the Company, its assets and liabilities, (ii) satisfied itself, in its sole and absolute discretion, that the Company's assets are being received in a satisfactory condition, (iii) satisfied itself, in its sole and absolute discretion, that the Company does not have any debts, liabilities or other obligations, whether absolute, contingent or otherwise which have not been disclosed in writing by the Seller, or are reflected in the financial statements, and (iv) satisfied itself, in its sole and absolute discretion, that the Company's licenses, permits and authorizations required for the Company to operate its business are valid. Such due diligence was

completed by the Buyer  fifteen (15) days before the execution of this Agreement (the "Due Diligence Period").

6.6 SHARE CERTIFICATES AND OTHER DOCUMENTS. The Seller shall have delivered to the Buyer stock certificates evidencing the Shares duly endorsed for transfer or accompanied by stock powers duly executed in blank. The Buyer shall have received ·from the Seller all such other documents and instruments, duly executed where required or appropriate, as it may reasonably request in connection with the transactions contemplated by this Agreement, as set forth in Section 1.1.

6.7 OPINION OF SELLER'S COUNSEL. The Seller shall have delivered an opinion of counsel in a form reasonably satisfactory to the Buyer.

6.8 CORPORATE ACTION. The Company's Board of Directors shall have approved the transactions contemplated by this Agreement if such approval is necessary under the Company's Articles of Incorporation or By-laws.

6.9 FAIRNESS OPINION. The Company shall have received an opinion from a financial advisor stating that the transactions contemplated by this Agreement are fair to the stockholders of the company from a financial prospective.

6.10 STOCKHOLDER APPROVAL. The stockholders of the Company shall have approved this Agreement at a meeting of the stockholders or pursuant to a consent solicitation.

ARTICLE VII

CONDITIONS TO THE OBLIGATION OF THE SELLER

Each and every obligation of the Seller under this Agreement shall be subject to the satisfaction by the Buyer, on or before January 31, 1998, of each of the following conditions, unless waived in writing by the Seller:

<PAGE>

7.1 REPRESENTATIONS AND WARRANTIES. The representations and warranties of the Buyer contained in Section IV and elsewhere in this Agreement and all information contained in any exhibit, certificate, schedule or attachment hereto or in any writing delivered by or on behalf of the Buyer to the Seller shall be true and correct when made, and shall be true in all material respects at and as of the Closing Date. The Buyer shall have performed and complied with all agreements, covenants, and conditions and shall have made all deliveries required by this Agreement to be performed, delivered and complied with by them prior to the Closing Date.

7.2 COVENANTS PERFORMED. All of the covenants, terms and conditions of this Agreement to be complied with and performed by the Buyer on or before the Closing Date shall have been duly complied and performed.

7.3 PURCHASE PRICE. The Buyer shall have delivered to the Seller the Purchase Price in accordance with Section 1.1 of this Agreement.

7.4 FAIRNESS OPINION. The Company shall have received an opinion from a financial advisor stating that the transactions contemplated by this Agreement are fair to the stockholders of the company from a financial prospective.

7.5 STOCKHOLDER APPROVAL. The stockholders of the Company shall have approved this Agreement at a meeting of the stockholders or pursuant to a consent solicitation.

ARTICLE VIII

INDEMNIFICATION

8.1 OBLIGATIONS OF BUYER. The Buyer agrees to defend, indemnify and hold harmless Seller from, against and in respect of any and all demands, claims, actions or causes of action, losses, liabilities, damages, assessments, deficiencies, taxes, cost and expenses,

http://www.sec.gov/Archives/edgar/data/789881/0001035802-99-000...

including, without limitation, interest, penalties and reasonable attorney's fees and expenses (collectively "Claims"), asserted against, imposed upon or paid, incurred or suffered by Seller as a result of, arising from, in connection with or incident to any material breach or material inaccuracy of any representation, warranty, covenant or agreement of the Buyer in this Agreement or in any document, certificate or other instrument related hereto.

·8.2 OBLIGATIONS OF SELLER. Seller agrees to defend, indemnify and hold harmless the Buyer from, against and in respect of any and all demands, claims actions or causes of action, losses, liabilities, damages, assessments, deficiencies, taxes, cost and expenses, including, without limitation, interest, penalties and reasonable attorney's fees and expenses (collectively "Claims"), · asserted against, imposed upon or paid, incurred or suffered by the Buyer as a result of, arising from, in connection with, or incident to (i) any breach or inaccuracy of any representation, warranty, covenant or agreement of Seller in this Agreement, or in any document, certificate or other instrument related

<PAGE>

hereto, (ii) the inability, failure or refusal of Seller to act in good faith in connection with this Agreement, or the transactions, agreements, documents and instruments delivered herewith or contemplated hereby, at any time from the date of this Agreement until the later in time of (a) the Closing Date, (b) the end of the Due Diligence Period and (c) which as of the Closing Date have not been undisclosed to the· Buyer in writing.

8.3 INDEMNIFICATION PROCEDURE. A party or parties hereto agreeing to be responsible for or to indemnify against any matter pursuant to this Agreement is referred to herein as the "Indemnifying Party" and the other party or parties claiming indemnification hereunder is referred to as the "Indemnified Party". An Indemnified Party under this Agreement shall give prompt written notice to the Indemnifying Party of any liability which might give rise to a claim for indemnity under this Agreement. As to any claim by a third party, the Indemnified Party may participate in the defense, compromise or settlement of any such matter through the Indemnified Party's own attorneys and at the Indemnifying Party's own expense; each of the indemnifying and the Indemnified Party shall provide such cooperation and such reasonable access to its books, records and properties as the other party shall reasonable request with respect to any such matter; and the parties hereto agree to cooperate with each other in order to ensure the proper and adequate defense thereof. The Buyer may setoff against the amount of any other payments due to Seller hereunder or otherwise, including, without limitation the Note, any and all amounts, due to the Buyer · pursuant to any and all claims that the Buyer may have against Seller hereunder including, without limitation, with respect to the indemnification of the Buyer hereunder by Seller.

An Indemnifying Party shall not make any settlement of any claims without the written consent of the Indemnified Party which consent shall not be unreasonably withheld. Without limiting the generality of the foregoing, it shall not be deemed unreasonable to withhold consent to a settlement involving injunctive or other equitable relief against the Indemnified Party or its assets, employees or business.

In a case where responsibility for a matter giving rise to a claim for indemnification is shared by the parties, any of the parties may elect to relieve the other of its obligations of indemnification with respect to such matter and, subject to the provisions of this section, such electing party may thereupon assume full control of the. resolution of such matter. If such election is not made, control shall also be shared.

ARTICLE IX

SURVIVAL OF TERMS; REPRESENTATIONS

9.1 SURVIVAL. The representations and warranties contained herein shall be true and correct as of January 31, 1999 as though such representations and warranties were made at and as of the Closing Date. All of these representations and warranties shall survive the

01/03/2007 WED 16:12  FAX                                    ☑102/103

consummation of all of the transactions contemplated by this
Agreement.

<PAGE>

## ARTICLE X

### MISCELLANEOUS PROVISIONS

10.1 BINDING AGREEMENT. This Agreement may not be transferred,
assigned, pledged or hypothecated all or in part by any party hereto
without the prior written consent of all the other parties hereto.
This Agreement shall be binding upon and shall inure to the benefit of
the parties hereto and their respective assigns and successors in
interest. No other person shall acquire or have any right under or by
virtue of this Agreement.

10.2 GOVERNING LAW. This Agreement, the rights and obligations of the
parties, and any other claims or disputes relating in anyway thereto
will be governed by and construed in accordance with the laws of the
State of Florida.

10.3 COUNTERPARTS, HEADINGS, ETC. This Agreement may be executed
simultaneously in any number of counterparts, each of which shall be
deemed an original, but all of which shall constitute one and the same
instrument. The headings herein are for convenience of reference only
and shall not be deemed a part of this Agreement.

10.4 NOTICES. Any notice or other communication required or permitted
hereunder shall be deemed validly given, made or served if in writing
and if delivered in person or sent by facsimile transmission or
registered or certified mail to the intended recipient at the
following address or to such other address or number as shall be
furnished in writing by any such party to the other:

If to the Seller:          Calixto Chaves
                           Inversiones La Ribera, S.A.
                           400 meters west of
                           National Panasonic Plant,
                           San Rafael Alajuela

If to the Buyer:           Calixto Chaves
                           95 Merrick Way,
                           Suite 507,
                           Coral Gables,
                           Florida, 33134

10.5 AMENDMENT; SEVERABILITY. This Agreement may be amended only by an
agreement in writing signed by the parties hereto. In case any
provision of this Agreement shall be held invalid, illegal or
unenforceable by any court, the validity, legality and enforceability
of the remaining provisions will not be affected or impaired thereby.

<PAGE>

10.6 ARBITRATION. Any dispute arising in connection with this
Agreement shall be exclusively settled by binding arbitration in the
Spanish language in Miami, Florida, in accordance with the Rules of
Arbitration and Conciliation of the International Chamber of Commerce.
Notwithstanding any provision in these rules, the arbitration panel at
any such arbitration proceeding shall consist of three arbitrators.
One arbitrator will be designated by Buyer, another arbitrator will be
designated by Seller and the third arbitrator will be a person
mutually agreed upon by Buyer and Seller. The arbitration panel shall
render its decision in writing, and such written decision and
conclusions with respect to the disputes so settled shall be final and
binding on the parties to the arbitration proceeding and confirmation
and enforcement of the awards so on the parties to the arbitration
proceeding and confirmation and enforcement of the awards so rendered
may be obtained and entered in any court having jurisdiction thereof.
Each of Buyer and Seller hereby irrevocably submits to the

☑103/103
http://www.sec.gov/Archives/edgar/data/789817/0001035802-99-000...

jurisdiction of any such court for purposes of enforcement of the
arbitration panel's decision.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to
be duly executed as of the day and year first above written.

SELLER:

BY:                /s/ CALIXTO CHAVES
   ------------------------------------
   CALIXTO CHAVES
   PRESIDENT
   INVERSIONES LA RIBERA, S.A.

BY:                /s/ CALIXTO CHAVES
   ------------------------------------
   CALIXTO CHAVES
   PRESIDENT
   COSTA RICA INTERNATIONAL, INC.

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.

HISTORY, S.A.                        0 6 - 2 7 6 8 0 CA 2 5

    Plaintiff,

vs.

RICA FOODS, INC.,

    Defendant.

_____/



## VERIFIED EX-PARTE MOTION FOR TEMPORARY INJUNCTION

    Plaintiff History, S.A. ('History"), by and through undersigned counsel and pursuant to the Florida Rules of Civil Procedure, hereby serves this Verified Ex-Parte Motion For Temporary Injunction against Defendant Rica Foods, Inc. ("Rica"), and in support thereof, states the following:

### INTRODUCTION

    1.    Plaintiff, History, S.A. is a Panamanian corporation.  History is the holder of four (4) promissory notes totaling $10,011,217.72 U.S. Dollars plus accrued interest in which Inversiones La Ribera, S.A., a Costa Rican corporation, is the debtor ("Notes").  True and correct copies of these notes are attached hereto as Exhibit "A."  La Ribera has defaulted on the subject Notes.

    2.    Defendant Rica is a public corporation recently de-listed from the American Stock Exchange as a result of various misrepresentations contained in its filings with the SEC.  Calixto Chaves ("Chaves") was at material times the President, Chief Executive Officer, Director and majority shareholder of Rica. Chaves also was the sole owner, President, Chief Executive Officer

1

and Director of Inversiones La Ribera, S.A., a Costa Rican holding company formed for the purpose of holding Chaves' assets.

3.      As more fully set forth below, because of the transfer of La Ribera's principal asset (an approximate 40% holding of the outstanding common stock of a large Costa Rican poultry producer, Pipasa, S.A.) to Rica and Rica's failure pay for or to provide any consideration to La Ribera for the transfer of La Ribera's holdings in Pipasa pursuant to an underlying Stock Purchase Agreement between La Ribera and Rica, La Ribera was unable to repay History on the Notes and did not have any assets against which History could pursue a security interest against as provided under Costa Rican law to recover on the Notes following La Ribera's default. As a result, History, has sustained substantial damages.

### La Ribera, Pipasa and Rica

4.      Inversiones La Ribera, S.A ("La Ribera") is a holding company and its principal asset was its holding and ownership of approximately 40% of the outstanding shares of Pipasa, S.A., a large Costa Rican poultry producer ("Pipasa").

5.      Prior to 1998, La Ribera and Rica collectively held all of the outstanding common stock shares of Pipasa. From 1998 through the present, Defendant Rica has been deeply involved in the day-to-day operations of Pipasa. In 1998, Rica held approximately 60% of Pipasa's outstanding common stock shares and La Ribera held the remaining approximate 40% of Pipasa's outstanding shares.

6.      On September 28, 1998, Rica entered into a stock purchase agreement with La Ribera in which Rica was to purchase the remaining approximate 40% of Pipasa's outstanding common stock which was held by La Ribera. In exchange, Rica agreed to transfer 11,050,784

2

shares of Rica's common stock (the "Rica Shares") to La Ribera.[1]  At this time, the Rica Shares had a fair market value of more than thirteen million dollars ($13,000,000.00).  A true and correct copy of the Stock Purchase Agreement between Rica and La Ribera filed with the Securities and Exchange Commission is attached hereto as Exhibit "C."  The Rica Shares were to be owned in full by La Ribera and was to be the source of collateral and security for the repayment of the Notes to History pursuant to Costa Rican law.

7.    On December 7, 1999, Rica publicly announced that it had acquired the remaining approximate 40% of outstanding common stock of Pipasa ("Pipasa Stock") through the Stock Purchase Agreement, making Pipasa a wholly owned subsidiary of Rica. A true and correct copy of the Rica's December 7, 1999 Form 8-K Report filed with the Securities Exchange Commission containing Rica's announcement is attached hereto as Exhibit "D." However, based on information obtained by History, it is believed that Rica never delivered to La Ribera the 3,683,595 Rica Shares pursuant to the Stock Purchase Agreement and as disclosed in Rica's filings with the Securities and Exchange Commission.

### The Notes

8.    On May 30, 2003, La Ribera issued four (4) promissory notes attached hereto as Composite Exhibit "A" payable to History in the total amount of $10,011,217.72 plus interest. Pursuant to the terms of the Notes, the Notes became due and payable on January 3, 2005.

9.    History made the Notes with La Ribera based on the representations contained in Rica's filings with the Securities and Exchange Commission as well as other mediums wherein Rica represented that the Rica Shares had been transferred to La Ribera in exchange for the transfer of the Pipasa Stock. In addition, in 1997, 1998 and 1999, while in Miami and prior to the

---

[1] Subsequently, Rica conducted a 3 for 1 reverse stock split which served to reduce the number of shares to be transferred to La Ribera pursuant to the Stock Purchase Agreement from 11,050,784 shares to 3,683,595 shares.

execution of the underlying Notes, Chaves as President and acting on behalf of Rica, personally assured Leonardo Lopez, the principal and majority shareholder of History, that the Rica Shares had been transferred to La Ribera. Again, in September, 2004, November, 2004 and in January, 2005, Chaves assured Leonardo Lopez of History that the Rica Shares had been transferred to La Ribera and served as security and collateral for the Notes under Costa Rican law.

10.      At the time the Notes were negotiated, Chaves, continuously assured History that Rica had transferred the 3,683,595 Rica Shares to La Ribera. Hence, History at all material times was led to believe and, in fact did believe, that the 3,683,595 Rica Shares were transferred to La Ribera and served to guarantee the repayment of the Notes.

11.      On or about January 3, 2005, the Notes became due and payable, but La Ribera failed to satisfy the Notes or any portion thereof despite History's repeated demands for payment. At the time the Notes matured and demand was made for payment, the market value of the 3,683,595 Rica Shares was approximately $19,670,397.00 which would have satisfied the underlying Notes had the Rica Shares been tendered to La Ribera pursuant to the Stock Purchase Agreement and served as collateral to satisfy unpaid loans under Costa Rican law.

12.      La Ribera held no assets to secure the Notes at the time the Notes became due based upon the fact that La Ribera's holdings in Pipasa had been transferred to Rica and the Rica Shares were not transferred to La Ribera pursuant to the Stock Purchase Agreement as represented by Rica and because La Ribera's other assets had been liquidated. Essentially, La Ribera became an empty shell and was unable to satisfy the Notes because of its wrongful transfer of the Pipasa Stock to Rica pursuant to the Stock Purchase Agreement and because of Rica's failure to transfer the 3,683,595 Rica Shares to La Ribera pursuant to the Stock Purchase Agreement.

13.    La Ribera has no intention of paying back the Notes.  In fact, at a meeting at the

office of Servicios Pastorales of the Catholic Church of Costa Rica which occurred on or about

September 28, 2005 and which was organized by Monsignior Angel Sancasimiro, the treasurer

of the Catholic Church of Costa Rica, and attended by Leonardo Lopez on behalf of History;

Father Guillermo Godinez, a representative of the Catholic Church of Costa Rica; and, Jorge

Torres, a representative of the Catholic Church, among others, those present were advised by

Rafael Morales, former counsel for La Ribera, that Victor Oconitrillo, officer and director of

Pipasa and Rica, and Calixto Chaves, officer and director of Pipasa, Rica, and La Ribera had

previously determined that La Ribera would not pay or satisfy the History Notes. There was no

justification given as to why La Ribera would not repay the Notes despite the repayment of other

debts of La Ribera through Chaves' other assets.

## ARGUMENT

14.    Based upon the fact that Rica, a publicly traded company recently delisted from

the American Stock Exchange, never delivered to La Ribera the 3,683,595 Rica common stock

shares pursuant to the Stock Purchase Agreement attached hereto as Exhibit "B" which were to

serve as security for the repayment of the underlying Notes under Costa Rican law as well as the

fact that La Ribera has become an empty shell by virtue of its transfer of the remaining

approximate 40% of the Pipasa shares to Rica pursuant to the Stock Purchase Agreement and the

liquidation of La Ribera's other assets, this Court should enjoin Rica, its employees, officers,

directors, representatives, transfer agents, representatives and other agents from selling,

transferring, or in any manner encumbering the Pipasa Stock transferred to Rica by La Ribera

pursuant to the Stock Purchase Agreement and for which La Ribera received no consideration

and thus it is appropriate for the Court to: a) assume control over Rica's respective financial

assets related to the Notes, namely the Pipasa Stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement; b) preserve assets and funds so as to prevent any further injury to Plaintiff; and, c) enter an injunction preventing Rica from selling, transferring or encumbering the Pipasa Stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement or any of the approximate 40% ownership interest in Pipasa Rica acquired through La Ribera's transfer of the Pipasa stock to Rica pursuant to the Stock Purchase Agreement.

15.    This Court certainly has jurisdiction to enter an order to ensure that Rica's holdings of the Pipasa Shares are not secreted or dissipated before the entry of a final judgment concluding this action and History's action against La Ribera related to the notes in Costa Rica.

16.    **Immediate Irreparable Injury**: As set forth herein, Plaintiff has suffered and continues to suffer immediate and irreparable injury, loss and damage as the result of Defendant's activities. Defendant failed and refused to transfer to La Ribera the 3,683,595 Rica Shares at a time when the shares were valued in excess of $19,000,000.00. The shares have now been delisted and are trading on the pink sheets, and their value has plummeted substantially. In addition, La Ribera is an "empty corporate shell" without any assets by virtue of the corporation's prior liquidation of assets as well as its wrongful transfer of its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase Agreement for which it received no consideration. Upon information and belief, Rica is now trying to sell all of its assets, including its holdings in Pipasa.. If Defendant is allowed to proceed with the sale or liquidation of the Pipasa Shares, the Plaintiff will have no avenue for any recovery related to La Ribera's failure to pay on the underlying Notes by virtue of Rica's acts.

17.    **Inadequate Legal Remedy**: Plaintiff has no adequate remedy at law against Rica because Rica was not a party to the underlying Notes and Plaintiff was not a party to the

underlying Stock Purchase Agreement between Rica and La Ribera. In addition, Plaintiff has no

adequate remedy at law because if Rica transfers or liquidates the Pipasa shares wrongfully

acquired from La Ribera through the Stock Purchase Agreement, any recovery Plaintiff may

obtain in its ancillary matter on the Notes against La Ribera in Costa Rica will be moot, because

La Ribera will have no assets to satisfy the judgment by virtue of the fact that La Ribera's

principal asset, its approximate 40% holding in Pipasa, was transferred to Rica pursuant to the

Stock Purchase Agreement and La Ribera did not receive the 3,683,595 Rica Shares or any other

consideration in return.   The Rica shares should have served as collateral for the History notes

and was the reason that History entered into the Notes with La Ribera. Rica should not be able to

maintain the benefit of the Pipasa Shares given its failure to provide any consideration for the

Pipasa Shares and if Rica sells, transfers or otherwise encumbers the subject Pipasa stock, History

will not have any legal remedy against Rica or any chance of recovery on the History Notes.

Thus, the threat of injury to Plaintiff, an innocent third party, outweighs any possible harm to

Defendants which might accrue by entry of an injunction preventing the transfer of the Rica's

Pipasa shares at issue.

     18.   **Substantial Likelihood of Success**:   Plaintiff has a substantial likelihood of

success on the merits of this case which are very straight forward.  Simply put, History is the

holder of four (4) promissory notes in which La Ribera is the debtor.  La Ribera did not pay

History on the Notes when the notes matured.  History was unable to recover on its security

interest in the Notes afforded under Costa Rican law that provides that all debts of a corporation

are secured by its assets because La Ribera is an "empty shell" because: 1) Rica never transferred

the 3,683,595 Rica Shares to La Ribera pursuant to the Stock Purchase Agreement; 2) La Ribera

transferred its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase

Agreement for which it received no consideration; and, 3) all or most of La Ribera's assets which could have provided security for History's Notes had been liquidated prior to the maturity of the Notes.    Based upon the fact that Rica did not provide any consideration for the Pipasa Shares obtained from La Ribera pursuant to the Stock Purchase Agreement, it is not a bona fide purchaser or holder in due course of the Pipasa Shares which, accordingly renders the Pipasa Shares an asset of La Ribera and should serve as security for the underlying Notes held by History.

19.    **Public Interest**:  The public interest would be greatly served in this matter by granting the requested injunction as it would support the public's desire and interest to promote foreign commercial transactions involving United States companies and would promote and support the reasonable expectations of parties involved in commercial transactions involving United States companies that the bargained for collateral to such transactions would be exchanged and preserved consistent with the parties' agreements. The public interest would also be served by reversing the inequitable conduct of Rica; and in an age of easy global mobility of capital, it preserves the attractiveness of the United States as a center for financial transactions.

20.    **Certificate of Notice:** No efforts have been made to give notice to Rica Foods, Inc., because the threat of irreparable harm exists, which forecloses opportunity to give reasonable notice. More specifically, the giving of such notice will simply precipitate or accelerate the acts being sought to be prohibited by the injunction as set forth above in Paragraph 16.

21.    **Bond**. Since there will be no resulting damage to Rica should the Court grant this motion, only a nominal bond is required.  In fact, Rica cannot show any damage resulting from

8

the Court enjoining the activity set forth herein as they have no legal right to retain the Pipasa

Shares and/are not legally entitled to retain the Pipasa Shares.

22.    **Clear Legal Right**: In light of the foregoing allegations contained in this verified

motion and the verified Complaint, Plaintiff has a clear legal right to the relief sought herein.

WHEREFORE, Plaintiff requests that this Court enjoin Defendant, Rica Foods, Inc., and any of

its principals, officers, directors, employees, transfer agents, representatives and other agents from:

a.    concealing, withholding, destroying or altering any of the books, records, forms,

writings, papers, and other documents relating to the transfer of the approximate 40% outstanding

common shares of Pipasa stock from La Ribera to Rica pursuant to the Stock Purchase

Agreement;

b.    disbursing, transferring, encumbering in any manner or otherwise using the

approximate 40% of the outstanding common shares of Pipasa stock transferred to Rica by La

Ribera pursuant to the Stock Purchase Agreement;

c.    disbursing, transferring or otherwise using funds derived from any sale or

encumbrance of the approximate 40% of the common shares of Pipasa stock transferred to Rica

by La Ribera pursuant to the Stock Purchase Agreement;

d.    In the event the shares have been sold or transferred, an accounting of the

consideration received in cash or otherwise as a result of the dissipation.

Date:    December 20, 2006                    Respectfully Submitted,

By: _____
Theodore C. Miloch II, Esq.
Florida Bar Number: 0040193
INFANTE, ZUMPANO, HUDSON & MILOCH, LLC
Attorney for Plaintiffs
Ponce de Leon Blvd.
Penthouse 1280
Coral Gables, FL 33134
Tel. 305.503.2990
Fax. 305.774.5908

9

## Declaration

Under penalties of perjury, I declare that I have read the foregoing Verified Ex Parte Motion Temporary Injunction and the facts stated in it are true.

Leonardo Lopez

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.    06-27680CA 25

HISTORY, S.A.

    Plaintiff,

vs.

RICA FOODS, INC.,

    Defendant.

_____/

ORIGINAL
FILED
DEC 21 2006
HARVEY RUVIN
CLERK

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S VERIFIED EX-PARTE MOTION FOR TEMPORARY INJUNCTION

    Plaintiff, History, S.A., by and through the undersigned counsel and pursuant to Florida

Rules of Civil Procedure, hereby files its Memorandum of law in Support of its Verified Ex-

Parte Motion for Temporary Injunction and states the following.

### PERTINENT FACTS

    1.    In its Complaint, Plaintiff, History, S.A. ("History") requests the Court to impose

a Constructive Trust on certain assets owned by Defendant, Rica Foods, Inc. ("Rica").

    2.    Specifically, History asserts that Inversiones La Ribera, S.A. ("La Ribera"), a

Costa Rican holding company, issued four promissory notes payable to History totaling

$10,011,217.72 with interest due on January 3, 2005 ("La Ribera Notes" or "Notes").

    3.    The La Ribera Notes were accepted by Leonardo Lopez, on behalf of History,

based on representations made by Calixto Chaves, on behalf of La Ribera and Rica Foods, Inc.,

that the Notes were secured by the principal asset of La Ribera, namely 3,683,595 Rica shares of

Common Stock ("Rica Shares"). Chaves assured Lopez that the Rica Shares were held by La

1

Ribera as a result of a 1998 stock purchase agreement ("Stock Purchase Agreement") between Rica and La Ribera wherein La Ribera sold its sole asset, a 40% stake in a profitable Costa Rican poultry company called Pipasa ("40% Pipasa Stake"), to Rica in exchange for the Rica Shares. The Stock Purchase Agreement was documented by Rica with the Securities and Exchange Commission in an 8-k filing.

4.      On January 3, 2005, the Notes matured and became due and payable to History. La Ribera did not pay the Notes when due and History was unable to pursue a security interest against the Rica Shares that purportedly "secured" the La Ribera Notes because Rica never transferred the Rica Shares pursuant to the Stock Purchase Agreement to La Ribera as was represented in SEC filings and by Rica's and La Ribera's agent, Calixto Chaves. Additionally, La Ribera had become an empty shell by virtue of the transfer of its principal asset, the 40% Stake in Pipasa to Rica pursuant to the Stock Purchase Agreement.

5.      By its refusal to transfer the Rica Shares to La Ribera, Rica failed to pay any consideration for the 40% Pipasa Stake acquired from La Ribera pursuant to the Stock Purchase Agreement. As a result of its failure to pay consideration for the Pipasa Stake, Rica has been unjustly enriched through its holding of the 40% Pipasa Stake and by retaining the Rica shares which were to have been transferred to La Ribera pursuant to the Stock Purchase Agreement.

6.      Defendant Rica has been recently delisted from the American Stock Exchange as a result of defective filings with the Securities and Exchange Commission as more fully set forth in the American Stock Exchange, LLC's Determination and Notification of Removal from Listing and/or Registration under Section 12(b) of the Securities Exchange Act of 1934, a true and correct copy of which is attached to Plaintiff's Complaint as Exhibit "B."

7.     In its Complaint and Verified *Ex Parte* Motion for Temporary Injunction, Plaintiff requests the Court to impose a constructive trust ("Constructive Trust") upon the 40% Pipasa Stake ("*Res*") held by Rica, as well as for injunctive relief to protect *pendente lite* the *Res* of the Constructive Trust while History asserts a breach of contract action against La Ribera in Costa Rica.

## SUMMARY OF ARGUMENT

8.     A Court may grant a temporary injunction if a party proves: (1) it would sustain irreparable injury if the injunction was not granted; (2) that it has no adequate remedy at law; (3) the substantial likelihood of success on the merits; and (4) that issuance of the injunction would serve the public interest. Provident Management Corp. v. City of Treasure Island, 796 So.2d 481 (FLA 2001). Plaintiff by and through its Motion for Injunctive Relief has successfully met each of these elements.   Plaintiff would sustain irreparable injury if the injunction is not granted because Rica is in the process of liquidating all of its assets, including its holdings in Pipasa, thus making it impossible for History to attach the Pipasa shares. Without the Pipasa shares, there would be no *Res* and therefore the Court could not impose the Constructive Trust, which would thereby negate any avenue of recovery for History against La Ribera. Secondly, History has no adequate remedy at law because it cannot sue La Ribera for damages as it is an empty shell by virtue of the liquidation of its assets, including its primary asset, the 40% Pipasa Stake.  Rica is in the process of liquidating all of its assets, including its holdings in Pipasa making it impossible for History to attach Pipasa shares. Third, History has a substantial likelihood of success on the merits of its underlying breach of contract action against La Ribera. Simply put, History is the holder of four promissory notes in which La Ribera failed to repay, thereby putting La Ribera in

3

breach. History is unable to recover on its security interest in the Notes, namely any assets of La Ribera, since La Ribera is an empty shell.

9.   Injunctive relief is appropriate to freeze the *Res* of the Constructive Trust because Florida Courts have recognized that if assets are not shielded from the potential for conversion or dissipation, they might no longer be within the jurisdiction of the court. If the assets are taken outside the court's jurisdiction, the *res* of any possible constructive trust would no longer be available, thereby rendering such equitable relief unattainable should Plaintiff ultimately prevail on the Complaint.

10.   History has shown, by its Motion for a Temporary Injunction that the *Res* is in probable danger of dissipation and there is a reasonable likelihood of success of the Constructive Trust count in the Complaint.

## ARGUMENT

**This Court should Grant History's Ex Parte Motion for Temporary Injunction because injunctive relief is appropriate to protect *pendente lite* what is asserted to be the *res* of a constructive trust.**

1.   **Injunctive relief is appropriate to freeze the *res* of a constructive trust upon showing that the *res* was in probable danger of dissipation and that there was reasonable likelihood of success of the constructive trust claim.**

Plaintiff has asserted in its Complaint the existence of a specific, identifiable trust *Res* comprised of the Pipasa Stake which legally belongs to La Ribera, not Rica Foods based upon Rica's failure to provide any consideration to La Ribera in support of the transfer. Equity jurisprudence provides that the *Res* is recoverable by means of a constructive trust. See e.g., Tabsch v. Nojaim, 548 So.2d 851 (Fla. 3rd DCA 1989). In Florida, injunctive relief is appropriate to protect *pendente lite* what is asserted to be the *res* of a constructive trust. Castillo v. Vlaminck de Castillo, 701 So.2d 1198 (Fla. 3d DCA 1997); Escudero v. Hasbun, 689 So.2d 1144 (Fla. 3d

4

DCA 1997); <u>Mendes v. Dowelanco Industrial LTDA.</u>, 651 So.2d 776 (Fla. 3rd DCA 1995); <u>Korn v. Ambassador Homes, Inc.</u>, 546 So.2d 756 (Fla. 3d DCA 1989); <u>Hudson Nat'l Bank v. Shapiro</u>, 695 F.Supp. 544 (S.D.Fla. 1988); <u>ITT Community Dev. Corp. v. Barton</u>, 457 F.Supp. 224 (M.D. Fla.1978).

The Third District Court of Appeal's holding in <u>Mendes</u> is instructive on this matter. In <u>Mendes</u>, the plaintiff, Dowelanco Industrial, LTDA, a Brazilian corporation, claimed that multiple Brazilian corporate and individual defendants embezzled monies from it in Brazil and eventually placed over one million dollars of it in several South Florida bank accounts. <u>Mendes</u>, 651 So.2d at 776. The plaintiff sued the Brazilian defendants in Florida asserting civil theft and a claim in equity for a constructive trust over the funds in the South Florida bank accounts, and secured an *ex parte* injunction freezing those accounts. <u>Id</u>. The defendants moved to dismiss the lawsuit and the injunction because all parties to the action were Brazilian and the alleged tortious acts occurred in Brazil. <u>Id</u>. *The trial court stayed the entire suit, but kept the* temporary injunction active, pending resolution of an action in Brazil involving the same parties and issues. Both sides appealed arguing for and against Florida as a proper forum. <u>Id</u>. The Third DCA held that dismissal of the suit in its entirety would be inappropriate "because of the realistic potential for dissipation of the funds now frozen by the injunction…" <u>Id</u>; <u>see</u> <u>Tabsch v. Nojaim</u>, 548 So.2d 851 (Fla. 3d DCA 1989) (temporary injunction freezing corporation's bank accounts where *res* of constructive trust consisted of corporation's bank accounts, court could reasonably conclude that there was a danger of dissipation of the corporate bank accounts). While the Court in <u>Mendes</u> concluded that Brazil was the proper forum for resolution of substantive issues because of various factors,[1] the Court upheld the injunction freezing the assets as "an appropriate

---

[1] The Court recognized that all parties were Brazilian, all parties were served in Brazil, the alleged tortious acts occurred in Brazil and another lawsuit on the same issue was proceeding in Brazil.

means of accomplishing resolution of the dispute in Brazil" in order to satisfy "any judgment the plaintiff may secure." Id. citing to Barclays Bank, S.A. v. Tsakos, 543 A.2d at 802; see Korn v. Ambassador Homes, Inc., 546 So.2d 756 (Fla. 3d DCA 1989) (temporary injunction was appropriate to freeze *res* of alleged constructive trust upon showing that *res* was in probable danger of dissipation and that there was reasonable likelihood of success of constructive trust claim); cf. Oxford Int'l Bank and Trust, Ltd. v Merrill Lynch, Pierce, Fenner & Smith, Inc., 374 So.2d 54 (Fla. 3d DCA 1979 (constructive trust situation is "clearly distinguishable from such cases which hold that pretrial injunctions or other restraints upon the dissipation of property, which serve merely to preserve funds for execution upon an eventual judgment, are unavailable in an action for money damages alone"). The Court in Mendes warned that such a ruling is "obviously appropriate only" if the *res*, or "the defendants' assets—their Florida bank accounts"-- are "properly the subject of the orders of the Florida court." Id.

In the underlying matter, History asserts a one count claim in equity for a constructive trust over the Pipasa Stock and moves for an *ex parte* temporary injunction to freeze those assets while a lawsuit against La Ribera for breach of repayment of promissory notes is proceeding in Costa Rica. As in Mendes, it would be entirely proper for this Honorable Court to use its equitable power to impose the *ex parte* temporary injunction sought by Plaintiff, thereby freezing and preventing the dissipation of the assets that compose the *res* of the alleged constructive trust, pending resolution of History's underlying action against La Ribera in Costa Rica. See also Castillo, 701 So.2d at 1198 (injunction was proper *pendente lite* because appellee sought the imposition of a constructive trust on an account where she alleged that son had improperly employed proceeds of her $200,000 check made payable to him, allegedly on understanding that he would purchase certificate of deposit on behalf of her, by establishing $200,000 account in his

6

name alone).  Additionally, like the Court in <u>Mendes</u> points out, there is no question that the assets History seeks to freeze are properly the subject of the orders of the Florida Courts since Rica is a U.S. Corporation with its primary place of business in Miami-Dade County.

### 2.  Plaintiff has met all requisite elements for injunctive relief.

Plaintiff, by and through its Motion for Temporary Injunction, has shown the requisite four elements to obtain injunctive relief: (1) it would sustain irreparable injury if the injunction was not granted; (2) that it has no adequate remedy at law; (3) the substantial likelihood of success on the merits of the underlying complaint against La Ribera; and (4) that issuance of the injunction would serve the public interest.  <u>See</u>  <u>Provident Management Corp. v. City of Treasure Island</u>, 796 So.2d 481 (FLA 2001) (recites four requisite elements).

First, History has suffered and continues to suffer immediate and irreparable injury, loss and damage as the result of La Ribera's failure to repay the Notes and because of Rica's failure to provide any consideration to La Ribera for the 40% Pipasa Stake. History does not have any legal remedy against Rica for its failure to provide any consideration to La Ribera for the transfer of the Pipasa Stake. <u>See</u> <u>Gonzalez v. Benoit</u>, 424 So.2d 957 (Fla. 3rd DCA 1983) (irreparable injury sufficient to justify grant of an injunction is in an injury of such a nature that it cannot be redressed in a court of law).  Defendant failed and refused to transfer to La Ribera the 3,683,595 Rica Shares at a time when the shares were valued in excess of $19,000,000.00. The shares have now been delisted and are trading on the pink sheets, and their value has plummeted substantially and they are virtually worthless as there is no market or demand for Rica shares.  In addition, La Ribera is an "empty corporate shell" without any assets by virtue of the corporation's prior liquidation of assets as well as its wrongful transfer of its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase Agreement for which it received no consideration.  Upon

information and belief, Rica is now trying to sell all of its assets, including its holdings in Pipasa. If Defendant is allowed to proceed with the sale or liquidation of the Pipasa Shares, the Plaintiff will have no avenue for any recovery related to La Ribera's failure to pay on the underlying Notes.

Second, History has no adequate remedy at law against Rica because Rica was not a party to the underlying Notes and Plaintiff was not a party to the underlying Stock Purchase Agreement between Rica and La Ribera. See St. Lawrence Co. v. Alkow Realty, 453 So.2d 514 (Fla. 4th DCA 1984) (the test of inadequacy of remedy at law is whether a judgment can be obtained); Mary Dee's, Inc. v. Tartamella, 492 So.2d 815, 816 (Fla. 4th DCA 1986). Additionally, if Rica transfers or liquidates the Pipasa Stake wrongfully acquired from La Ribera through the Stock Purchase Agreement, any recovery Plaintiff may obtain in its ancillary matter on the Notes against La Ribera in Costa Rica will be moot, because La Ribera will have no assets to satisfy the judgment by virtue of the fact that La Ribera's principal asset, its approximate 40% holding in Pipasa, was transferred to Rica pursuant to the Stock Purchase Agreement and La Ribera did not receive the 3,683,595 Rica Shares or any other consideration in return.  The Rica shares should have served as collateral for the History notes and was the reason that History entered into the Notes with La Ribera.  Rica should not be able to maintain the benefit of the Pipasa Shares given its failure to provide any consideration for the Pipasa Shares and if Rica sells, transfers or otherwise encumbers the subject Pipasa stock, History will not have any legal remedy against Rica or any chance of recovery on the History Notes.  Thus, the threat of injury to Plaintiff, an innocent third party, outweighs any possible harm to Defendants which might accrue by entry of an injunction preventing the transfer of the Rica's Pipasa shares at issue.

8

Third, History has a substantial likelihood of success on its constructive trust claim. See Korn, 546 So.2d at 756 (temporary injunction was appropriate to freeze *res* of alleged constructive trust upon showing that there was reasonable likelihood of success of constructive trust claim). Plaintiff has a substantial likelihood of success on the merits of this case which are very straight forward. Simply put, History is the holder of four (4) promissory notes in which La Ribera is the debtor. La Ribera did not pay History on the Notes when the notes matured. History was unable to recover on its security interest in the Notes afforded under Costa Rican law that provides that all debts of a corporation are secured by its assets because La Ribera is an "empty shell" resulting from: 1) Rica never transferring the 3,683,595 Rica Shares to La Ribera pursuant to the Stock Purchase Agreement; 2) La Ribera transferring its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase Agreement for which it received no consideration; and, 3) all or most of La Ribera's assets which could have provided security for History's Notes having been liquidated prior to the maturity of the Notes. Based upon the fact that Rica did not provide any consideration for the Pipasa Shares obtained from La Ribera pursuant to the Stock Purchase Agreement, it is not a bona fide purchaser or holder in due course of the Pipasa Shares which, accordingly renders the Pipasa Shares an asset of La Ribera and should serve as security for the underlying Notes held by History.

Finally, the public interest would be greatly served in this matter by granting the requested injunction as it would support the public's desire and interest to promote foreign commercial transactions involving United States companies and would promote and support the reasonable expectations of parties involved in commercial transactions involving United States companies that the bargained for collateral to such transactions would be exchanged and preserved consistent with the parties' agreements. See Grupo Mexicano de Desarrollo, S.A. v.

9

Alliance Bond Fund, Inc., 527 U.S. 308 (1999). The public interest would also be served by reversing the inequitable conduct of Rica; and in an age of easy global mobility of capital, it preserves the attractiveness of the United States as a center for financial transactions.

## CONCLUSION

In conclusion, based upon the facts outlined in the Complaint, the *Ex Parte* Motion for Temporary Injunction and the legal authority cited herein, the Court can reasonably conclude that there is an immediate danger of dissipation of Rica's assets, most notably the *Res* of the Constructive trust, i.e. the 40% Pipasa Stake, and that Plaintiff has met its burden to obtain injunctive relief. Accordingly, it is appropriate that the court protect the 40% Pipasa Stake through a temporary injunction as it is suitable for the Court to enter a constructive trust over the Pipasa shares for satisfaction of any judgment History may secure in its underlying action in Costa Rica.

Respectfully Submitted,

Attorney for Plaintiff
Theodore Miloch, II, Esq.
FL Bar No: 004193
INFANTE, ZUMPANO
HUDSON & MILOCH, LLC
2801 Ponce de Leon
Penthouse 1280
Coral Gables, FL 33134
Tel: 305-503-2990
Fax: 305-774-5908

10

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.

HISTORY, S.A.

     Plaintiff,

vs.

RICA FOODS, INC.,

     Defendant.

_____/

## ORDER GRANTING PLAINTIFF, HISTORY, S.A.'S VERIFIED
## EX-PARTE MOTION FOR TEMPORARY INJUNCTION

THIS CAUSE came to be heard on Plaintiff's, History, S.A. ("History" or "Plaintiff"),

Verified *Ex-Parte* Motion for Temporary Injunction ("Motion"), and the Court having been duly

informed on the premises, it is hereby:

ORDER AND ADJUDGED that:

1.     Based upon the facts contained in Plaintiff's Verified Motion, Verified Complaint

and findings herein, the Court finds that the Plaintiff has commenced a claim for Constructive

Trust against certain shares of Pipasa Stock ("Pipasa Shares") held by Defendant, Rica Foods,

Inc. ("Rica" or "Defendant"), which were transferred to Rica by Inversiones La Ribera, S.A.

("La Ribera") pursuant to the Stock Purchase Agreement attached to Plaintiff's Verified Motion

as Exhibit "C." The Court also finds, based upon representations contained in Plaintiff's Verified

Motion that the Pipasa Shares were transferred to Rica by La Ribera and that Rica never

provided any consideration to La Ribera for the transfer of the Pipasa Shares and that Rica may

sell or otherwise transfer the subject Pipasa Shares.

     2.     Plaintiff's Motion is hereby Granted. The Court finds that a temporary injunction is warranted to prevent Defendant, Rica, its employees, officers, directors, representatives, transfer agents, representatives and other agents from selling, transferring, or in any manner encumbering the Pipasa Stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement and for which La Ribera received no consideration. More importantly, if Defendant is allowed to proceed with the sale or liquidation of the Pipasa Shares, the Plaintiff will have no avenue for any recovery related to La Ribera's failure to pay on the underlying Notes by virtue of the liquidation of La Ribera's assets as well as the transfer of the Pipasa stock to Rica pursuant to the Stock Purchase Agreement and for which La Ribera received no consideration.

     3.     This Court has jurisdiction to enter an order to ensure that Rica's holdings of the Pipasa Shares are not secreted or dissipated before the entry of a final judgment concluding this action and History's action against La Ribera related to the notes in Costa Rica.

     4.     **Immediate Irreparable Injury**: This Court finds that the Plaintiff has suffered and continues to suffer immediate and irreparable injury, loss and damage as the result of Defendant's activities. Defendant failed and refused to transfer to La Ribera the 3,683,595 Rica Shares following the maturation of the Notes at a time when the shares were valued in excess of $19,000,000.00. The shares have now been delisted and are trading on the pink sheets, and their value has plummeted substantially. In addition, La Ribera is an "empty corporate shell" without any assets by virtue of the corporation's prior liquidation of assets as well as its wrongful transfer of its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase Agreement for which it received no consideration. Upon information and belief, Rica is now trying to sell all of its assets, including its holdings in Pipasa. If Defendant is allowed to proceed with the sale or

liquidation of the Pipasa Shares, the Plaintiff will have no avenue for any recovery related to La Ribera's failure to pay on the underlying Notes by virtue of Rica's acts.

5. **Inadequate Legal Remedy**:  This Court finds that the Plaintiff has no adequate remedy at law against Rica because Rica was not a party to the underlying Notes and Plaintiff was not a party to the underlying Stock Purchase Agreement between Rica and La Ribera.  In addition, Plaintiff has no adequate remedy at law because if Rica transfers or liquidates the Pipasa shares wrongfully acquired from La Ribera through the Stock Purchase Agreement, any recovery Plaintiff may obtain in its ancillary matter on the Notes against La Ribera in Costa Rica will be moot, because La Ribera will have no assets to satisfy the judgment by virtue of the fact that La Ribera's principal asset, its approximate 40% holding in Pipasa, was transferred to Rica pursuant to the Stock Purchase Agreement and La Ribera did not receive the 3,683,595 Rica Shares or any other consideration in return.   The Rica shares should have served as collateral for the History notes and was the reason that History entered into the Notes with La Ribera.  Rica should not be able to maintain the benefit of the Pipasa Shares given its failure to provide any consideration for the Pipasa Shares and if Rica sells, transfers or otherwise encumbers the subject Pipasa stock, History will not have any legal remedy against Rica or any chance of recovery on the History Notes.  Thus, the threat of injury to Plaintiff, an innocent third party, outweighs any possible harm to Defendants which might accrue by entry of an injunction preventing the transfer of the Rica's Pipasa shares at issue.

6. **Substantial Likelihood of Success**:  This Court finds that the Plaintiff has a substantial likelihood of success on the merits of this case which are very straight forward.  More specifically, History is the holder of four (4) promissory notes in which La Ribera is the debtor.  La Ribera did not pay History on the Notes when the notes matured.  History was unable to

recover on its security interest in the Notes afforded under Costa Rican law that provides that all debts of a corporation are secured by its assets because La Ribera is an "empty shell" because: 1) Rica never transferred the 3,683,595 Rica Shares to La Ribera in return for Pipasa shares transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement; 2) La Ribera transferred its approximate 40% holding in Pipasa to Rica pursuant to the Stock Purchase Agreement for which it received no consideration; and, 3) all or most of La Ribera's assets which could have provided security for History's Notes had been liquidated prior to the maturity of the Notes. In light of the fact that Rica did not provide any consideration for the Pipasa Shares obtained from La Ribera pursuant to the Stock Purchase Agreement, it is not a bona fide purchaser or holder in due course of the Pipasa Shares which, accordingly renders the Pipasa Shares an asset of La Ribera and may as security for the underlying Notes held by History.

7. **Public Interest**: This Court finds the public interest would be greatly served in this matter as it would support the public's desire and interest to promote foreign commercial transactions involving United States companies and would promote and support the reasonable expectations of parties involved in commercial transactions involving United States companies that the bargained for collateral to such transactions would be exchanged and preserved consistent with the parties' agreements. The public interest would also be served by reversing the inequitable conduct of Rica; and in an age of easy global mobility of capital, it preserves the attractiveness of the United States as a center for financial transactions.

8. **Certificate of Notice**: Pursuant to Fla. R. Civ. P 1.610(a), no efforts were made to give notice to Rica Foods, Inc., because the threat of irreparable harm exists, which forecloses opportunity to give reasonable notice. More specifically, the giving of such notice will simply

precipitate or accelerate the acts being sought to be prohibited by the injunction as set forth above in Paragraph 4.

9.      **Bond**. Pursuant to Fla. R. Civ. P 1.610(b), the Court finds that a bond in the amount of $_____, conditioned for the payment of costs and damages sustained by the adverse party if the party is wrongfully enjoined, is reasonable and proper. More specifically because there will be no resulting damage to Rica. In fact, based upon the foregoing allegations contained in Plaintiff's Verified *Ex-Parte* Motion for Temporary Injunction, Verified Complaint and findings herein this Court finds that Rica cannot show any damage resulting from the Court enjoining the activity set forth herein as they have no legal right to retain the Pipasa Shares and/are not legally entitled to retain the Pipasa Shares. Plaintiff shall file the bond with the Clerk of the Court no later than January 8, 2007.

10.     **Clear Legal Right**: In light of the foregoing allegations contained in Plaintiff's Verified *Ex-Parte* Motion for Temporary Injunction, the verified Complaint and findings herein this Court finds that the Plaintiff has a clear legal right to the relief sought herein.

11.     Based upon the foregoing allegations contained in Plaintiff's Verified *Ex-Parte* Motion for Temporary Injunction, Verified Complaint and findings herein this Court immediately enjoins Defendant, Rica Foods, Inc., and any of its principals, officers, directors, employees, transfer agents, representatives and other agents from:

a.      concealing, withholding, destroying or altering any of the books, records, forms, writings, papers, and other documents relating to the transfer of the approximate 40% outstanding common shares of Pipasa stock from La Ribera to Rica pursuant to the Stock Purchase Agreement;

b.      disbursing, transferring, encumbering in any manner or otherwise using the approximate 40% of the outstanding common shares of Pipasa stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement;

c.      disbursing, transferring or otherwise using funds derived from any sale or encumbrance of the approximate 40% of the common shares of Pipasa stock transferred to Rica by La Ribera pursuant to the Stock Purchase Agreement;

d.      In the event the shares have been sold or transferred, an accounting of the consideration received in cash or otherwise as a result of the sale or transfer of the Pipasa Shares.

DONE AND ORDERED in Miami-Dade County, Florida this ___day of December, 2006.

_____
CIRCUIT COURT JUDGE

# EXHIBIT 2

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

Case No.:  06-27680-CA-25

HISTORY, S.A.,

      Plaintiff,

v.

RICA FOODS, INC.,

      Defendant.

_____/

## NOTICE OF FILING NOTICE OF REMOVAL

The defendant Rica Foods, Inc., hereby gives notice that it has removed this

cause to the United States District Court for the Southern District of Florida.  A

copy of the Notice of Removal, without attachments, is attached hereto as **Exhibit 1**.

      Respectfully submitted,

      Hogan & Hartson L.L.P.
      Attorneys for Defendant
      Mellon Financial Center
      1111 Brickell Avenue, Suite 1900
      Miami, Florida 33131
      Telephone:  (305) 459-6500
      Facsimile:  (305) 459-6550

By: _____
      Daniel E. González
      Florida Bar No. 780030
      Richard C. Lorenzo
      Florida Bar No. 071412
      Maria Eugenia Ramirez
      Florida Bar No. 349320

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

by U.S. mail this 10th day of January, 2007, to Theodore C. Miloch II, Esquire,

Infante, Zumpano, Hudson & Miloch, LLC, Ponce de Leon Blvd., Penthouse 1280,

Coral Gables, Florida 33134.

By: _____
Daniel E. González

2

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

**07-20088**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

HISTORY, S.A.

**DEFENDANTS** CIV-UNGARO-BENAGES

RICA FOODS, INC.

MAGISTRATE JUDGE O'SULLIVAN

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Theodore C. Miloch, II, Esq., Infante, Zumpano, Hudson & Miloch, LLC, 2801 Ponce de Leon Boulevard, Penthouse 1280, Coral Gables, Florida 33134, Telephone: (305) 502-2990, Facsimile: (205) 774-5908

Attorneys (If Known)

Hogan & Hartson LLP, 1111 Brickell Avenue, Suite 1900, Miami, Florida 33131, Telephone: (305) 459-6500

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)
☐ 2 U.S. Government Defendant

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

DADE 07-20088-CV- UNGARO   O'SULLIVAN

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☑ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☑ YES ☐ NO

JUDGE Paul C. Huck    DOCKET NUMBER 06-20710-CIV-Huck

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Action for constructive trust and permanent injunction. Court has jurisdiction pursuant to 28 U.S.C. § 1332.

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE January 10, 2007

FOR OFFICE USE ONLY

AMOUNT $350.00   RECEIPT # 952855

d/10/07